UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

STEVEN SCOZZARI, Representative
of the Estate of William Christi Scozzari,

       Plaintiff,

v.                                  Case Number 08-10997-BC
                                   Honorable Thomas L. Ludington
CITY OF CLARE, KEN HIBL, DWAYNE
MIEDZIANOWSKI, JEREMY MCGRAW,

       Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART, DENYING IN PART, AND HOLDING
IN ABEYANCE IN PART MIEDZIANOWSKI AND MCGRAW'S MOTION FOR
SUMMARY JUDGMENT, GRANTING IN PART, DENYING IN PART, AND HOLDING
IN ABEYANCE IN PART THE CITY AND HIBL'S MOTION FOR SUMMARY
JUDGMENT, AND DIRECTING SUPPLEMENTAL BRIEFING ON BOTH MOTIONS**

      Plaintiff Steven Scozzari ("Plaintiff"), on behalf of the estate of his deceased brother,

William Scozzari ("Scozzari"), filed a complaint on March 7, 2008, and an amended complaint on

June 25, 2009, alleging claims arising out of the shooting death of Scozzari on or about September

18, 2007. The amended complaint alleges the following claims in separately numbered counts

against the City of Clare ("the City"), City Manager Ken Hibl ("Hibl"), City Police Chief Dwayne

Miedzianowski ("the Chief"), and Officer Jeremy McGraw ("Officer McGraw"): (1) excessive force

and deliberate indifference to a serious medical need constitutional violations pursuant to 42 U.S.C.

§ 1983; (2) municipal liability under § 1983; (3) assault and battery; (4) gross negligence under

Mich. Comp. Laws § 691.1407; (5) civil conspiracy to violate Scozzari's civil rights; and (6)

discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132.

      Now before the Court are the City and Hibl's motion for summary judgment [Dkt. # 68], and

the Chief and Officer McGraw's (collectively, "the Officers") motion for summary judgment [Dkt. # 71], filed on November 12 and 13, 2009, respectively. Plaintiff filed a single response [Dkt. # 81] to both motions on December 8, 2009. Replies were filed by the City and Hibl [Dkt. # 86], and the Chief and Officer McGraw [Dkt. # 87] on December 15, 2009.

The Court has reviewed the parties' submissions and finds that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the Officers' motion will be granted in part and supplemental briefing directed as to Plaintiff's Fourth Amendment claims pursuant to § 1983, denied as to Plaintiff's deliberate indifference to a serious medical need claims pursuant to § 1983, supplemental briefing directed as to Plaintiff's assault and battery claim, and granted as to Plaintiff's gross negligence and civil conspiracy claims. Additionally, the City and Hibl's motion will be denied as to municipal liability pursuant to § 1983, granted as to Plaintiff's civil conspiracy claims and all of Plaintiff's claims against Hibl, and supplemental briefing directed on Plaintiff's ADA claims.

I

Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A fact is "material" if its resolution affects the

outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The party who bears the burden of proof must present a jury question as to each element of the claim, *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000), rather than raise only "metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895

(6th Cir. 1991).

II

The shooting death of Scozzari by the Chief and Officer McGraw took place in or near the parking lot of the Lone Pine Motel in the City of Clare, Michigan, between eleven o'clock and midnight on September 18, 2007. The Lone Pine Motel consists of several buildings, including several stand-alone cabins and a two-story building with several motel rooms, *see* Pl. Br. Ex. 2, and provides for overnight stays and extended lodging. The motel is located at 1508 North McEwan Street, on the east side of the street, south of Wilcox Parkway. Just to the north of Wilcox Parkway and the motel property, there is a park and a Veterans of Foreign Wars ("VFW") building.

At the time of his death, Scozzari had lived in cabin seventeen at the Lone Pine Motel for seven to ten years. Cabin seventeen is located in the northwest area of the motel property. To the east of cabin seventeen are at least two other cabins, numbers eighteen and nineteen. Jeff Richardson was a guest who stayed in cabin eighteen, and Jeff Morgan II and his girlfriend, Sheryl Irwin, were guests who stayed in cabin nineteen. The doors to these particular cabins faced south. A short sidewalk led from the door of each cabin to a sidewalk that effectively connected the row of cabins. *See* Pl. Br. Ex. 38.

A long, rectangular, two-story building with several motel rooms was south of cabins seventeen, eighteen, and nineteen, and essentially perpendicular to that row of cabins. *See* Pl. Br. Ex. 2. Jason Miller was a guest in motel room five, and the door to his room faced west. Jeff Morgan Sr. and Jacob Morgan were guests in a motel room on the second floor. Also to the south of cabins seventeen, eighteen, and nineteen, further to the east and parallel to the long motel building, was another cabin or row of cabins, consisting of at least cabin twenty. Wanetta Gibbons

-4-

stayed in cabin twenty and was responsible for cleaning the cabins and motel rooms. The door to cabin twenty faced west.

Plaintiff asserts that fifty-one year old Scozzari was hard of hearing, blind in one eye, had diminished sight out of the other eye, and sometimes used a cane while walking. Scozzari was five feet three inches tall and weighed 113 pounds. Pl. Br. Ex. 4 (autopsy). Plaintiff asserts that Scozzari was a diagnosed schizophrenic on disability and under the care of the Clare County Mental Health Department. Timothy Rynearson, the prior owner of the Lone Pine Motel and the prior police chief, testified that at some point, "Mark" from County Mental Health asked if there was a cabin that Scozzari could stay in. Rynearson Tr. 13, June 26, 2009. Wanetta Gibbons testified that she saw Mark Tucker, a social worker, visit Scozzari, although the last time Gibbons had seen Tucker was probably three years ago. Gibbons Tr. 14-15, Oct. 24, 2008. Gibbons testified that Scozzari was a hermit and had not allowed anyone, not even family, to enter his cabin in years. Gibbons Tr. 18-19, 57, 83. Rynearson testified that Scozzari was a "pack rat." Rynearson Tr. 18. While Scozzari loved to collect knives and hatchets, he had no police record, and Rynearson had never witnessed Scozzari engage in any threatening behavior. Rynearson Tr. 24-25, 57, 59, 61, 99-100. Scozzari would not talk to people, he only "grunted." Rynearson Tr. 25-26. When Rynearson was police chief, everybody in the department knew Scozzari because he walked around a lot, wore winter coats in the summer and his boots unlaced, and was generally disheveled. Rynearson Tr. 54-55, 101.

At about 11:05 p.m. on September 18, 2007, Jason Miller, the guest in motel room five, called Clare County 911 to report what sounded like shots fired from the direction of the park just north of the motel. Pl. Br. Ex. 1 (Clare Police Dep't incident report). The Chief was dispatched to investigate the incident and arrived at a parking lot near North McEwan Street and Wilcox Parkway

within minutes. *Id.*; Pl. Br. Ex. 13 (the Chief and Officer McGraw's combined incident report). The Chief saw a flashlight coming from around east of the VFW building between ten and fifty feet away. Chief Tr. 65, June 30, 2009; Pl. Br. Ex. 13. While the Chief did not have his own flashlight at that time, he was able to see Scozzari. Chief Tr. 67-68. For safety purposes, the Chief asked Scozzari to drop what appeared to be a brown colored stick carried on Scozzari's left shoulder, although the Chief could not identify what the "brown stick" was at the time. Chief Tr. 67-68; Pl. Br. Ex. 13. The Chief asked Scozzari to come over so that the two men could hear each other. Chief Tr. 67.

Scozzari responded to the Chief's requests to drop the stick and to come over by saying, "fuck you, boy" and continuing to walk. Chief Tr. 69; Pl. Br. Ex. 13. The Chief testified that Scozzari's response did not anger him. Chief Tr. 70. However, the Chief also testified that "it became alarming to me knowing there was a misdemeanor violation already in the park after hours, was he the person with the gun and that's why he wouldn't talk to me and that's why he's trying to just keep walking, and was the gun in that backpack or on him somewhere else is that why he didn't want to talk to me." Chief Tr. 70-71.

The Chief followed Scozzari at a distance of about fifteen feet, and Scozzari was looking back at the Chief as they were walking. Chief Tr. 74; Pl. Br. Ex. 13. The Chief told Scozzari to stop and to put the stick down, and Scozzari again responded by saying "fuck you" and did not stop walking. Chief Tr. 74; Pl. Br. Ex. 13. The two men entered the parking lot of the motel near cabin seventeen and the Chief lost sight of Scozzari for a minute as he went around the corner of a cabin. Chief Tr. 75. The Chief caught up to within five to ten feet of Scozzari and Scozzari appeared to pull the stick back in his left hand. Chief Tr. 74-76; Pl. Br. Ex. 13. The Chief backed up and yelled

at Scozzari to drop the stick.  Chief Tr. 77; Pl. Br. Ex. 13.  Scozzari brought the stick down as he reached towards his waist with his right hand and walked towards the Chief.  Chief Tr. 77-78; Pl. Br. Ex. 13.  The Chief attempted to pepper spray Scozzari in the face and then ran behind a truck. Chief Tr. 77-78; Pl. Br. Ex. 13.[1]  Scozzari kept walking towards the Chief and continued to pull an item out of his waistband, which the Chief eventually recognized as a knife.  Chief Tr. 78; Pl. Br. Ex. 13.[2]  The Chief drew his service weapon, pointed it at Scozzari, and yelled at Scozzari to put the knife back.  Chief Tr. 80; Pl. Br. Ex. 13.  Scozzari turned around, walked into cabin seventeen, and closed the cabin door.  Chief Tr. 80; Pl. Br. Ex. 13. The Chief believed that Scozzari had assaulted him when he cocked his arm back with the stick and reached for a knife.  Chief Tr. 80-82.

Meanwhile, at 11:07 p.m., Officer McGraw was dispatched and arrived on the scene at 11:14 p.m., a couple of minutes after Scozzari entered cabin seventeen. Pl. Br. Ex. 1; Chief Tr. 82; Pl. Br. Ex. 13.  As Officer McGraw was en route, the Chief, who was becoming increasingly agitated, called Officer McGraw two to four times on his cell phone to find out Officer McGraw's location. McGraw Tr. 120; Pl. Br. Ex. 13.  The Chief met up with Officer McGraw on the west side of cabin seventeen, briefed Officer McGraw, and the two men walked around to investigate the area.  Chief Tr. 85-86; McGraw Tr. 123; Pl. Br. Ex. 13.  McGraw testified that the Chief informed him that "he had just dealt with a male that had pulled out a possible cane and threatened him . . . he . . . took cover behind a vehicle to protect himself and the male walked away and entered cabin 17.  The

---

[1]  Plaintiff disputes that the Chief pepper-sprayed Scozzari based on the fact that no witnesses reported or could recall the distinctive smell of pepper spray on Scozzari.  *See* McGraw Tr. 230-31, June 23, 2009; Kunik Tr. 9, Aug. 14, 2009; C. Bryans 10, Aug. 14, 2009; W. Bryans 8, Aug. 14, 2009.

[2]  Plaintiff contends that it was unlikely that Scozzari had a knife in his waistband when the report of Michigan State Police Trooper Amy Denher indicated that Scozzari's pants were four or five times too large for Scozzari.  Pl. Br. Ex. 33.

[C]hief stated he believed that the male possibly had some mental issues." McGraw Tr. 145; Pl. Br. Ex. 13. Officer McGraw acknowledged that he did not record in his report anything about the Chief telling him that he had drawn his gun on Scozzari. McGraw Tr. 147-49.

After he reported the "shots fired," Jason Miller, the guest in motel room five, was standing in the motel parking lot when he heard voices to the north, beyond the cabins, saying "get away kid" and "knife," along with other unintelligible words. Miller Tr. 18-23, Dec. 3, 2008. After that, Miller saw the Chief running south toward Miller from the north end of the motel property, then circling around the parking lot and heading back to the north. Miller Tr. 25-28. Then Miller saw Officer McGraw arrive and meet up with the Chief to the west of cabin seventeen, the two Officers spoke for a minute and began to walk behind and beside the cabins. Miller Tr. 29-31. At a point when Miller saw the Officers again, Miller was about thirty feet away from cabin seventeen, and Officer McGraw came over to Miller and asked him whether he had seen anybody running. Miller Tr. 30. Miller responded that he had not, and when the Officers were walking away, Miller heard the Chief say, "he's going to jail tonight" and "something that sounded . . . like 'mental problems' or 'mental issues.' " Miller Tr. 33.

Officer McGraw testified that he had received "general," but never "specific" directives on how police officers are supposed to handle suspects with believed mental issues. McGraw Tr. 150. City Manager Hibl testified he had never distributed any policies, directives, training sessions, or other materials relating to the ADA to the City's police department. Hibl Tr. 12-13, Aug. 5, 2009.

Next, the Chief and Officer McGraw went to cabin seventeen to arrest Scozzari, based on the encounter between the Chief and Scozzari. Chief Tr. 89; Pl. Br. Ex. 13. The Chief believed that he had the right to arrest Scozzari based on the earlier encounter and the fact that the Officers did

not know whether Scozzari "belonged in that cabin." Chief Tr. 89-90. The Chief acknowledged that it was not a "hot pursuit" situation, but thought there may have been probable cause or exigent circumstances if he "felt someone else in there might be in jeopardy." Chief Tr. 93-94.

From the right side of the door to cabin seventeen, and at the Chief's direction, Officer McGraw struck the cabin door three to five times, while his taser was in one hand, stating, "police, open the door." McGraw Tr. 234-35; Pl. Br. Ex. 13. The Chief was standing to the left of the door, a bit further away from the door, to the southwest. McGraw Tr. 231; Pl. Br. Ex. 13. The door handle was on the left side of the door and the door hinged on the right side. Pl. Br. Ex. 22. Scozzari opened the door inward and was "almost face to face" with Officer McGraw. McGraw Tr. 241.

Officer McGraw saw that Scozzari had a twelve-inch "military style" knife in his left hand, and a fifteen-inch hatchet in his right hand. Pl. Br. Ex. 13. Both weapons were in sheaths, but Officer McGraw observed Scozzari attempting to take the sheath off the military style knife. Pl. Br. Ex. 13. The Chief was only aware that Scozzari was fumbling with something in his hands. Pl. Br. Ex. 13. The Officers yelled for Scozzari to drop what was in his hands. Pl. Br. Ex. 13. Both Officers saw that Scozzari did not comply and instead took a step towards Officer McGraw. Pl. Br. Ex. 13. Officer McGraw deployed his taser, which neither Officer believed took effect because Scozzari turned and entered cabin seventeen. Pl. Br. Ex. 13.

The Chief heard Officer McGraw yell that Scozzari was "going for something" in the cabin, and Officer McGraw attempted to kick open the door, which had not completely latched shut. Pl. Br. Ex. 13. It is not clear whether Officer McGraw successfully kicked open the door or Scozzari opened it. Pl. Br. Ex. 13. The Chief reported Officer McGraw kicked open the door and then the

Chief saw through the cabin door window that Scozzari had his back to Officer McGraw and was fumbling with something.  Pl. Br. Ex. 13.  The Chief then kicked the door "to stop Scozzari from grabbing any weapons."  Pl. Br. Ex. 13.  In some contrast, Officer McGraw reported that Scozzari opened the door after Officer McGraw could not kick it open.  Pl. Br. Ex. 13.

Both Officers saw that Scozzari again had knives in his hands, raised over his head.  Pl. Br. Ex. 13.  Officer McGraw saw Scozzari trying to take the sheath off the hatchet.  Pl. Br. Ex. 13.  The Officers yelled for Scozzari to drop the weapons, but Scozzari refused and told the Officers to drop their weapons.  Pl. Br. Ex. 13.  The Chief backed up to the southwest and Officer McGraw backed up to the southeast.  Pl. Br. Ex. 13.  The two Officers ended up about ten feet away from each other.  Chief Tr. 103-05.

Scozzari began to exit the cabin and stepped onto the sidewalk in front of the cabin.  Chief Tr. 103-04. Officer McGraw thought Scozzari was going to attack him, so Officer McGraw quickly stepped backwards.  Pl. Br. Ex. 13.  Officer McGraw fell backwards, tripping on a wooden barrier about twelve to eighteen inches high between the sidewalk and the parking lot, *see* Pl. Br. Ex. 36, 38, and Scozzari continued to approach him with the hatchet unsheathed.  Pl. Br. Ex. 13.  Officer McGraw threw his taser to the side after he fumbled reloading it.  Pl. Br. Ex. 13.

There is some discrepancy between Officer McGraw and the Chief's report, described in the preceding paragraph, and Officer McGraw's testimony.  Officer McGraw testified that as he fell, he shot his taser at Scozzari, who was about five to six feet away.  McGraw Tr. 243.  Then, Scozzari stepped back into the cabin and closed the door.  McGraw Tr. 244.  Within two seconds, Scozzari came back out of the cabin with "like three weapons in his hands," while Officer McGraw was still on his side, trying to reload the taser.  McGraw Tr. 244; Chief Tr. 103.  Scozzari advanced towards

Officer McGraw, who threw his taser to the side after he could not reload it, and was scurrying backwards. McGraw Tr. 244-45.

Nonetheless, at some point while Officer McGraw was on the ground, Scozzari stepped over the barrier, putting himself about six feet from the cabin door and three to five feet from Officer McGraw. *Id.* 175, 245-46; Chief Tr. 105; Pl. Br. Ex. 13. Officer McGraw was afraid for his life. McGraw Tr. 246-47. The Chief started shooting at Scozzari, who was about ten feet from the Chief and still advancing towards Officer McGraw. McGraw Tr. 246-47; Chief Tr. 107; Pl. Br. Ex. 13. Officer McGraw tried to get up and scoot backwards. McGraw Tr. 247-49. After the Chief started shooting, Scozzari turned towards the Chief, Officer McGraw started to shoot at Scozzari, Scozzari then turned towards the cabin, took two or three steps, and fell face down over the wooden barrier towards the cabin. McGraw Tr. 175-176, 179, 181, 247-51; Pl. Br. Ex. 13.

Officer McGraw only recalled shooting two or three times, from his chest as he was attempting to stand up, but he later learned he had shot eight times. *Id.* 179, 247-49; Pl. Br. Ex. 13. The autopsy report and Michigan State Police laboratory report suggest that Officer McGraw fired his gun seven times and hit Scozzari five times, while the Chief fired his gun four times and did not hit Scozzari. Pl. Br. Exs. 4, 20.

At the point when the Chief and Officer McGraw approached the door to cabin seventeen, Jason Miller was still watching the events unfold from about forty feet away. Miller Tr. 39. Before the door to cabin seventeen opened, Miller heard a voice, or voices, shouting "at the individual who was inside" to "drop the knife" at least a dozen times. Miller Tr. 34-40. Around the last time he heard "drop the knife," the Chief started backing up about ten more feet from the cabin towards the southwest. Miller Tr. 40-41. It was after that when Miller heard the door to the cabin begin to

squeak open. Miller 42. Miller testified that although he was focused on the cabin, he could not see the individual inside the cabin, and had lost sight of Officer McGraw. Miller Tr. 42. As the door opened, Miller again heard "drop the knife" repeatedly. Miller Tr. 43-44. The door stopped opening, Miller heard a "pop" and saw a "spark," which he recognized as coming from a taser, and the door slammed shut. Miller Tr. 44.

Miller continued to hear the Officers say "drop the knife" even after Scozzari's cabin door was closed. Miller Tr. 47. When the door reopened, Miller could still see the Chief about ten to fifteen feet from Scozzari's cabin, but Miller could not see Officer McGraw. Miller Tr. 48. At some point, Miller heard another voice say "put your gun down." Miller Tr. 49. Miller could no longer see any light coming from the door and he could not see anyone standing in the doorway. Miller Tr. 50. Then, shots were fired, and Miller saw Scozzari in the threshold of the door with his left arm extended, holding a six to seven inch object in his hand. Miller Tr. 50-52. Miller heard eleven or twelve shots and saw Scozzari fall to the ground. Miller Tr. 53-54. Miller did not see Officer McGraw until after the shooting, when Officer McGraw approached the fallen Scozzari. Miller Tr. 57-58.

Wanetta Gibbons saw some of the events through her cabin door window – she looked directly west and could see down the sidewalk to Scozzari's cabin. Gibbons Tr. 39. To start, she woke up to hear more than one person yelling more than once, "drop the knife"; she did not hear a taser or other confrontation. Gibbons Tr. 30, 38, 45, 81-82. She looked out her window to see the two Officers with their guns drawn standing in the parking lot directly in front of Scozzari's cabin. Gibbons Tr. 39. Scozzari was on the sidewalk and started to place one foot beyond the wooden barrier on the edge of the sidewalk, with an arm extended in front of him; Gibbons did not see

anything in Scozzari's hands. Gibbons Tr. 39-40, 65-66. According to Gibbons, both Officers were standing and about fifteen feet from Scozzari when they backed up and shot Scozzari. Gibbons Tr. 44, 78-79; Pl. Br. Ex. 19. As he was shot, Scozzari's body twisted clockwise halfway back towards his front door. Gibbons Tr. 58.

Jeff Richardson, who stayed in cabin eighteen, was awakened by the sound of "yelling voices and footsteps running past [his] cabin," a cabin door being slammed shut or kicked open, and a taser "going off." Richardson Tr. 13, Jan. 16, 2009. He heard the Officers yelling "put the weapons down," saw the taser on the ground and the Officers with their guns drawn, about twelve to fifteen feet from each other and ten feet from Scozzari's cabin. Richardson Tr. 17, 22, 28. Richardson could not see Scozzari and testified that if Scozzari had stepped very far out from the cabin, he would have been able to see Scozzari because he could see the edge of the sidewalk. Richardson Tr. 17, 34. Both Officers appeared to be nervous and were stepping around in an "antsy" fashion. Richardson Tr. 29. The Officers never left Richardson's view and he never saw Officer McGraw fall down, although he thought that Officer McGraw might have tripped over the wooden barrier at the edge of the sidewalk. Richardson Tr. 50, 55. Richardson testified that McGraw would back up, bring his gun up higher, then relax and step forward. Richardson Tr. 28, 51. Officer McGraw was standing for some time before and when he shot Scozzari. Richardson Tr. 55-56.

Jeff Morgan II, who stayed in cabin nineteen, also witnessed the Chief when he initially entered the motel property, and when Officer McGraw arrived on the scene. Morgan II Tr. 18-20, July 27, 2009. Morgan II saw the Chief carrying a flashlight. Morgan II Tr. 11-13. Eventually, he heard the Officers "booting the door down" of Scozzari's cabin and yelling at Scozzari to come out of the cabin. Morgan II Tr. 20. He did not hear Scozzari say anything. Morgan II Tr. 22. He could

-13-

see the Officers in front of Scozzari's cabin.  Morgan Tr. II 25, 54.  He saw Scozzari briefly, as Scozzari was reentering the cabin, and before Officer McGraw deployed his taser.  Morgan II Tr. 25, 53.  He heard the Officers yelling at Scozzari to drop the weapons before and after Officer McGraw deployed his taser.  Morgan Tr. II 28.  He saw Officer McGraw deploy his taser.  Morgan II Tr. 28.

While Morgan II testified that there were times that he could not see the Chief based on his viewing angle from his cabin door, he testified that Officer McGraw shot first.  Morgan II Tr. 34-35, 56.  Again, because of the angle, he could not see Scozzari, but he testified that Officer McGraw was about twenty feet from Scozzari's cabin when he shot at Scozzari with his gun, in the same position from where he shot the taser.  Morgan II Tr. 35, 55-57.  Morgan II never saw Officer McGraw fall down or on the ground and saw him shoot his gun while standing.  Morgan II Tr. 57.  Ultimately, Morgan II testified that he heard ten or eleven shots, although the Michigan State Police report states that Morgan II reported hearing five or six shots.  Morgan II Tr. 31.  The testimony of Morgan II's girlfriend, Sheryl Irwin, generally corroborates his testimony, although her testimony was less confident.  *See, e.g.*, Irwin Tr. 66, Apr. 3, 2009.

Plaintiff asserts that the analysis of Michigan State Police ballistics technician Reinhart Pope supports the conclusion that Officer McGraw was standing when he shot at Scozzari.  Pope testified concerning three bullets and the holes they caused in cabin walls, which are referred to as "A," "B," and "C."  Pope testified that the bullet holes and locations of the cartridge cases are consistent with the Chief firing from the southwest and Officer McGraw firing from the southeast at the end of the perpendicular motel building.  Pope Tr. 20-21, Oct. 7, 2009.

Bullet A entered the front cabin wall east of the cabin door from the southwest, and was

traceable to the Chief.  *See* Pl. Br. Ex. 36 (photograph); Pope Tr. 8, 13-16.  Bullets B and C entered the cabin slightly from the southeast and are likely traceable to Officer McGraw.  Bullet B entered the cabin east of the cabin door 39.5 inches above the ground and 38.5 inches west of the southeast corner of the cabin.  Pope Tr. 14.  Bullet C entered the cabin east of the cabin door 10.5 inches above the ground and 52 inches west of the southeast corner of the cabin.  Pope Tr. 13, 24; Pl. Br. Ex. 38 (photograph).  Pope did not measure the angles at which the bullets entered the cabin, but testified that the bullet holes were "at slight downward angles" and not "upward from the ground up."  Pope Tr. 33.  Pope further testified that the angles were "consistent with the bullet having been fired by, say, a person standing rather than a person laying on the ground – because if I had the – if the shot was in an upward angle, then that would be consistent, you know, with the person maybe laying on the ground shooting up.  But because they were, you know, relatively level or slightly downward trajectory, then that's consistent with perhaps the person not laying on the ground."  Pope Tr. 69.

After Scozzari fell, the Chief called for a mobile medical response ambulance ("MMR") and requested that it "stage" across the street until the scene could be secured.  Pl. Br. Ex. 13.  Plaintiff asserts that it was two minutes and thirty-seven seconds from the time the shooting was reported (11:26:09) to the time that the request for medical assistance was made (11:28:46).  *See* Pl. Br. Ex. 1, 26.  While the medical team arrived at the scene promptly, it was not able to render medical assistance until 11:38.  *See* Pl. Br. Ex. 1, 26.  Testimony from the emergency medical technicians suggest that it is common for medical personnel to wait to approach a patient until the scene is cleared for safety.  *See* Kunik Tr. 34; W. Bryans Tr. 7-8; C. Bryans Tr. 5-6.  The medical team took Scozzari to the hospital at 11:56.  Pl. Br. Ex. 26.

Both Officers reported that the knife and the hatchet were still "gripped" in Scozzari's hands

after he fell and they yelled for Scozzari to drop the knives.  Pl. Br. Ex. 13.  The Officers reported that the Chief directed Officer McGraw to remove the weapons from Scozzari's hands while the Chief covered Officer McGraw with his gun drawn.  Pl. Br. Ex. 13; McGraw Tr. 162.  First, however, the Chief directed that they wait a minute to make sure that Scozzari was not faking it. McGraw Tr. 158, 162-65.

When Officer McGraw approached the fallen Scozzari, he saw Scozzari's body shaking and heard gurgling sounds coming from his mouth.  Pl. Br. Ex. 13; McGraw Tr. 157, 162.  Officer McGraw stepped on each of Scozzari's wrists as he removed each knife and tossed them to the west. Pl. Br. Ex. 13; Chief Tr. 111.  Officer McGraw reported finding three other knives in Scozzari's waistband or nearby, which he tossed to the same place.  Pl. Br. Ex. 13.  Officer McGraw then unsuccessfully checked for Scozzari's pulse, flipped Scozzari over onto his back, checked unsuccessfully for a pulse again, then  handcuffed Scozzari's hands in front of him.  Pl. Br. Ex. 13; Chief Tr. 111.  Meanwhile, the Chief called MMR onto the scene and paramedics Carl Bryans, Winnie Bryans, Nate Kunik, and Stacy Salminen took over.  Pl. Br. Ex. 13.

After the shots were fired, Jeff Morgan Sr. and his minor son, J.M., went out onto the second floor balcony of their motel room.  J.M. saw Officer McGraw standing over Scozzari, shouting "drop the knives," although J.M. did not see any weapons.  J.M. Tr. 15, July 27, 2009.  J.M. saw an Officer enter Scozzari's cabin, and then place a hatchet and knife by the police car about twenty feet from the door to Scozzari's cabin.  J.M. Tr. 15.  Jeff Morgan Sr. saw an Officer enter the cabin and come out with two objects that he put on the sidewalk past Scozzari's body.  Morgan Sr. Tr. 125, July 27, 2009.  Jeff Morgan Sr. and J.M. returned to their room for a moment and when they returned to the balcony, the knife and the hatchet were near Scozzari.  J.M. Tr. 16.

McGraw reported that when people came out of nearby cabins, the Chief asked a few of them to come over and witness the knives in Scozzari's hands. Pl. Br. Ex. 13. The Chief testified that he did not recall approaching any guests of the motel cabins and asking them to come out and observe Scozzari's body or the positioning of the weapons. Chief Tr. 111. Richardson testified that one of the Officers "started banging on doors," and asked him to witness the weapons, while Scozzari was still breathing. Richardson Tr. 35. Officer McGraw then told Richardson to go inside and Officer McGraw brought others to Scozzari's body to witness the weapons. Richardson Tr. 35.

Jeff Morgan II also testified that an Officer brought him over to observe Scozzari's body and the weapons. Morgan II Tr. 57-58. J.M. saw his brother, Morgan II, speaking to the Officers near Scozzari's body. J.M. Tr. 50. Morgan II acknowledged that a knife may have been "oddly placed." Morgan II Tr. 57-58. Morgan II's girlfriend, Sheryl Irwin, testified that she was called to observe the body and weapons after Morgan II. Irwin Tr. 68-69. She testified that the knife placement did not look "normal" and recalled earlier reporting that the knife was "in the hand pointing up perfectly." Irwin Tr. 68-69.

The Chief testified that neither he nor Officer McGraw entered Scozzari's cabin after the shooting. Chief Tr. 113. He also testified that neither he nor Officer McGraw placed the knives back near Scozzari's hands after Officer McGraw moved them to the side. Chief Tr. 111. Michigan State Police evidence technician Scott Hrcka testified that a print of Scozzari's right ring finger was on a knife with a black handle. Hrcka Tr. 4, Oct. 7, 2009.

Plaintiff asserts that the Clare police, County deputies, the Sheriff, the Prosecutor and the Michigan State Police arrived on the scene after the shooting. Michigan State Police Detective Jerry Carter ("Detective Carter") was assigned to lead the investigation. He arrived at the scene about an

hour after the shooting.  Carter Tr. 52, Oct. 22, 2008.

Officer McGraw called his union representative, Officer David Saad ("Officer Saad"), who came to the scene and took Officer McGraw to the Clare police station.  After the investigation got underway, the Chief also went to the Clare police station.  The Chief and Officer McGraw remained at the police station for several hours.  Officer Saad was informed by the Chief that Officer McGraw did not need to make a statement, answer any questions, or "invoke Garrity" at that time because the Chief had also been involved in the incident.  Saad Tr. 13, 23, Aug. 5, 2009.  Detective Carter testified that Officer McGraw told  him that he would not be giving a statement based on the advice he had received from Officer Saad.  Carter Tr. 44.  Detective Carter also testified that the Chief informed him that he would not be giving a statement.  Carter Tr. 44.  The Chief did not recall Detective Carter trying to talk to him.  Chief Tr. 27.  Carter testified that he arranged to meet with the Chief the next day, September 20, 2007, at 10:00 a.m., but the Chief canceled the meeting on the advice of the City Attorney.  Carter Tr. 45-46.  The Chief testified that City Manager Hibl and the City Attorney decided that they would meet at the City Attorney's office for Officer McGraw and the Chief to give their written statements to Carter.  Chief Tr. 32.  The meeting was rescheduled for September 24, 2007 at 11:00 a.m.  Carter Tr. 47.  At the scheduled meeting, Detective Carter received the reports prepared by the Chief and Officer McGraw.  Carter Tr. 65; *see also* Pl. Br. Ex. 13.[3]

It is not apparent when the reports, which were merged into one document, were prepared.

---

[3] Ex-Chief  Rynearson testified that "shortly after" the shooting, the Chief told him that he had been filling out paperwork from a prior complaint when he saw Scozzari by the VFW with a flashlight, that Scozzari assaulted the Chief with his cane, and that the Chief pepper-sprayed Scozzari before allowing him to walk away and deciding to wait for Officer McGraw.  Rynearson 33.  Rynearson further testified that the Chief told him that he felt that he had put Officer McGraw in harm's way, and that he had to shoot until the threat was gone.  Rynearson 31.

*See* Pl. Br. Ex. 13; Chief Tr. 19. The Chief testified that he prepared his report "a couple days later, maybe three days later or so" after the shooting. Chief. Tr. 19. He testified that he prepared his report or a "primary narrative" on his office computer and then Officer McGraw prepared a "supplemental report," that the computer automatically attached to the primary report. Chief. Tr. 19. Officer McGraw testified that he prepared his report on September 24, 2007, and was aided by Officer Saad. McGraw Tr. 21-22. The Chief testified that the Officers were not together when each prepared his respective report. Chief Tr. 19-21.

While the Chief and Officer McGraw disclaim any substantive communication with each other from September 18, 2007 until the meeting on September 24, 2007, Plaintiff contends that their telephone records suggest that the two Officers had at least one ten minute conversation on September 20, 2007. *See* Pl. Br. Exs. 31, 32. Plaintiff asserts that the Officers were required to maintain their telephone records by a court order entered on March 14, 2008, *see* [Dkt. # 3], but the Officers reported that they did not have access to their records based on the age of the records. Despite this, Plaintiff was able to obtain some of the records through subpoenas directed to the telephone companies. Plaintiff asserts that the records suggest that the Chief switched cell phones after September 20, 2007, because the records end on that date.

Ultimately, the City, the Michigan State Police, and a Clare County Prosecutor concluded that the shooting was self-defense and justifiable homicide. *See* City Br. Ex. 5 (Hibl's review of incident, County Prosecutor's review of incident); City Br. Ex. 6 (memorandum of County Prosecutor). Plaintiff contends that the conclusions are faulty because the investigators were not armed with the Chief and Officer McGraw's reports when they examined the scene and spoke to witnesses. In particular, the investigators were not aware of the importance of gathering information

regarding Officer McGraw's distance from Scozzari and whether Officer McGraw was on the ground or standing when the Officers shot Scozzari.

III

In their motion for summary judgment, Chief Miedzianowski and Officer McGraw raise four primary arguments: (1) they are entitled to summary judgment and qualified immunity on Plaintiff's Fourth Amendment excessive force claims and Plaintiff's deliberate indifference to a serious medical need claims brought pursuant to § 1983; (2) they are entitled to absolute immunity or governmental immunity on Plaintiff's assault and battery claims under Michigan law; (3) they are entitled to summary judgment on Plaintiff's gross negligence claims under Michigan law because Plaintiff has plead the intentional tort of assault and battery; and (4) both Officers are entitled to summary judgment on Plaintiff's civil conspiracy claims because Plaintiff has sued as the representative of the estate of Scozzari and cannot pursue claims that may have accrued to him personally.

A

Under § 1983, an individual may bring a private right of action against anyone, who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statutes. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *Maine v. Thiboutot*, 448 U.S. 1 (1980). The Chief and Officer McGraw contend that they are entitled to summary judgment on Plaintiff's § 1983 claims on the basis of qualified immunity, along with the underlying merits. Generally, summary judgment based on qualified immunity is proper if the law did not put the officer on notice that his conduct would be clearly unlawful. *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002). However, if genuine issues of material fact exist as to whether

the officer committed acts that would violate a clearly established right, then summary judgment is improper. *Poe v. Haydon*, 853 F.2d 418, 425-26 (6th Cir. 1988).

"Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  The privilege serves the purpose of, early in litigation, preventing suits from progressing because qualified immunity is immunity from suit, not merely a defense to liability.  *See id.* at 200-201 (emphasis in original).  Qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2001) (citation omitted).

The Sixth Circuit undertakes a three step analysis to determine whether an official is entitled to immunity:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred.  Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known.  Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Id.* at 901.  *See Pearson v. Callahan*, - - - U.S. - - - -, 129 S. Ct. 808, 818 (2009) (finding that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

With regard to the second step, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted). *See Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) ("In determining whether a constitutional right is clearly established, the court must first look to decisions of the U.S. Supreme Court, then to decisions of the Sixth Circuit, and, finally to decisions of other circuits."). "This standard requires the courts to examine the asserted right at a relatively high level of specificity," and "on a fact-specific, case-by-case basis." *Cope v. Heltsley*, 128 F.3d 452, 458-59 (6th Cir. 1997).

Generally, there are two ways in which a plaintiff may show that "officers were on notice that they were violating a 'clearly established' constitutional right." *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005). First, "where the violation was sufficiently 'obvious' under the general standards of constitutional care . . . the plaintiff need not show 'a body' of 'materially similar' case law." *Id.* (quoting *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004)). Second, the violation may be shown "by the failure to adhere to a 'particularized' body of precedent that 'squarely govern[s] the case." *Id.* (quoting *Brousseau*, 543 U.S. at 201).

1

The Chief and Officer McGraw contend that Plaintiff cannot establish a Fourth Amendment excessive force violation because the use of deadly force was "objectively reasonable" under the circumstances. In *Tennessee v. Garner*, the U.S. Supreme Court established that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth

Amendment." 471 U.S. 1, 7 (1985). The Court explained that the reasonableness of the use of a particular level of force is evaluated by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 8 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)) (further citations omitted). With respect to the "nature and quality of the intrusion," the extent of the intrusion is considered, along with "when . . . and also how it is carried out." *Id.* The ultimate question is "whether the totality of the circumstances justified a particular sort of search or seizure." *Id.* at 8-9.

Necessarily then, even when probable cause to seize a suspect exists, "an officer may not always do so by killing him." *Id.* at 9. In particular, the Court rejected the view that "shooting nondangerous fleeing suspects is so vital as to outweigh the suspect's interest in his own life." *Id.* at 11. In other words, "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Id.* "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm . . . it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.* "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11-12.

In *Graham v. Connor*, the Supreme Court further expounded on the reasonableness of the use of varying degrees of force. 490 U.S. 386 (1989). The Court explained:

Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *See Tennessee v. Garner*, 471 U.S. at 8-9 (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

490 U.S. at 396. The Court emphasized that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citation omitted).

In *Davenport v. Causey*, the Sixth Circuit acknowledged that "[g]iven the extreme intrusion caused by use of deadly force, the countervailing governmental interests must be weighty indeed; 'only in rare instances may an officer seize a suspect by use of deadly force.' " 521 F.3d 544, 551 (6th Cir. 2008) (quotation omitted). The court summarized:

The government's interest in using deadly force to effect a seizure varies based upon the circumstances faced by the officers; "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," and so the question is whether the amount of force used by the officer was excessive. *See Graham*, 490 U.S. at 396. *Garner* stated that deadly force can be used when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. . . ." 471 U.S. at 11-12. "Probable cause," while

-24-

"incapable of precise definition," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (unanimous), means that the facts and circumstances of which the officer is aware and are reasonably viewed as accurate are "sufficient unto themselves to warrant a man of reasonable caution to believe that" deadly force is necessary, *see Berger v. New York*, 388 U.S. 41, 55 (1967).

*Id.*

The court noted that "[t]he most common considerations are 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Id.* (quoting *Graham*, 490 U.S. at 396).  Other considerations include "the number of lives at risk," "the demeanor of the suspect," "the size and stature of the parties involved," whether the suspect was "fighting with the police," and whether the suspect was "intoxicated and noncompliant." *Id.* (quotations and citations omitted).  The court emphasized that "[t]he officer must also be given some leeway when a court analyzes the reasonableness of his decision.  It is firstly important to remember what is a 'reasonable' belief could also be a mistaken belief, and that the fact it turned out to be mistaken does not undermine its reasonableness as considered at the time of the acts." *Id.* at 552.  This " 'measure of deference' 'carries great weight' when 'all parties agree that the events in question happened very quickly.' " *Id.* (quotation omitted).  "The facts and circumstances are viewed objectively, from the perspective of a reasonable officer, and therefore the subjective intent or motivation of the officer is irrelevant." *Id.* (citing *Graham* 490 U.S. at 397).  In *Davenport*, the court found that the use of deadly force was not objectively unreasonable when "[t]he officers were facing a large, violent, and angry individual who was unwilling to be brought under control by the officers.  Mr. Davenport had already knocked Officer Causey to the ground and was delivering blows in rapid succession to Officer Pugh's head." *Id.* at 553.

In *Gaddis v. Redford Township*, the Sixth Circuit Court of Appeals clarified that "[i]n this circuit, courts faced with an excessive force case that involves several uses of force must generally 'analyze the . . . claims separately.' " 364 F.3d 763, 772 (6th Cir. 2004) (quotation omitted); *see also Livermore v. Lubelan*, 476 F.3d 397 (6th Cir. 2007) ("The proper approach under Sixth Circuit precedent is to view excessive force claims in segments."). Courts should "identify the seizure and proceed to examine whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create those circumstances." *Id.* (quotation omitted).

In *Gaddis*, the Sixth Circuit found that the use of deadly force was not objectively unreasonable when the undisputed evidence demonstrated that the motorist stopped by the police eventually used a "windmilling motion" to strike at an officer with a knife. *Id.* "An attack with a knife certainly meets th[e] criterion" that "[l]ethal force is justified in order to protect a fellow officer or a civilian from a threat of serious physical harm." *Id.* at 776 (citation omitted). The Court distinguished cases from other circuits where the suspect had not actually used the knife but had simply been opening a knife or approaching with a knife: "Here, again, Gaddis had a knife and used it." *Id.* at 777 (distinguishing *Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir. 1990), and *Zuchel v. City of Denver*, 997 F.2d 730 (10th Cir. 1993)).

The Sixth Circuit also cautioned in *Gaddis* that "minor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when . . . the witness views the event from a worse vantage point than that of the officers." *Id.* at 773 n.8 (quoting *Anderson v. Russell*, 247 F.3d 125, 130-31 (4th Cir. 2001)). In other words, a "minor conflict of perception is common, and is not sufficient by itself to create a material dispute of fact as to the officers'

credibility." *Id.* at 773.

In *Kirby v. Duva*, the Sixth Circuit explained that it was clearly established that "deadly force could not be used against a non-dangerous fleeing felon." 530 F.3d 475, 477 (6th Cir. 2008). "Where a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive." *Id.* at 482 (citing *Sigley v. City of Parma Heights*, 437 F.3d 527, 534-35 (6th Cir. 2006)) (further citations omitted). The court found it was critical that "defendants had sufficient time under plaintiffs' account to assess the situation before firing several rounds at Kirby" when "the incident may have taken up to two minutes to play out." *Id.* at 482-83. In other words, "this was not . . . a situation that required a 'split-second' decision." *Id.* at 483 (citations omitted). "[T]he fact that a situation unfolds relatively quickly 'does not, by itself, permit [officers] to use deadly force.' " *Id.* (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)).

In *Chappell v. City of Cleveland*, the Sixth Circuit found that the officer-defendants were entitled to qualified immunity. 585 F.3d 901, 904 (6th Cir. 2009). The officers were investigating an armed robbery that had just occurred and suspected an individual who lived in the area and had admitted to several armed robberies three months earlier. *Id.* In the early hours of the next morning, after securing a search warrant, the officers were let into the home where the suspect lived with his grandmother, but were not informed that the suspect was home. *Id.* at 904-05. The house was dark and when they barged into the suspect's bedroom, they spotted the suspect hiding in his closet. *Id.* at 905. The officers ordered the suspect out, the suspect hesitated, and then came out of the closet holding a knife. *Id.* The suspect ignored commands to drop the knife and moved quickly towards the officers. *Id.* Both officers fired at the suspect killing him. *Id.* In granting qualified immunity, the court emphasized that the officers were "backed up against a wall in the small bedroom and there

was no ready means of retreat or escape.  Considering [the suspect's] stature (5'7", 165 lbs.) And

the size of the knife (described and depicted in photograph as a standard 'steak knife' with serrated

edge), it is apparent that if the detectives had hesitated one instant, i.e., long enough to allow [the

suspect] to take even one more step, they would have been within his arm's reach and vulnerable

to serious or even fatal injury." *Id.* at 911.  The court further explained that "the events before the

shooting are not a factor in determining whether the [officers] had probable cause to use deadly

force once they entered the bedroom." *Id.* at 914.

The Chief and Officer McGraw contend that they are entitled to qualified immunity and

summary judgment on the merits of Plaintiff's excessive force Fourth Amendment claims because

the facts of this case are like those of *Chappell*, 585 F.3d 901.  Primarily, the Officers emphasize

that "[b]oth cases involve the fatal firing of weapons at a suspect who threatened the officers with

a knife, refused the officers' commands to drop the weapon and continued to approach the officers,

coming within seven feet from the officers and causing them to believe that they were in immediate

harm."  Officers' Br. 13.  The Officers also contend that the evidence offered by Plaintiff to contest

whether Scozzari was holding any weapons is insufficient to raise a genuine issue of material fact,

given the evidence that Scozzari was holding weapons, and the respective vantage points of the

Officers and various witnesses.

In response, Plaintiff emphasizes the key differences between this case and *Chappell*.

Plaintiff highlights the fact that multiple witnesses testified that Scozzari was as far as ten to twenty

feet from Officer McGraw, and even further from the Chief.  Plaintiff highlights that Officer

McGraw had not fallen as he has repeatedly asserted because multiple witnesses saw him shooting

from a standing position, his testimony is inconsistent with his report as to when he fell, and bullets

B and C entered the cabin at a slightly downward angle. Plaintiff highlights that because of the distance between Scozzari and Officer McGraw, the fact that Officer McGraw had not fallen, the open space behind the Officers, and the lack of quick movement from Scozzari, the Officers had the ability to retreat to address their safety concerns.

The conflicts in testimony highlighted by Plaintiff are more than minor as to the distance between Officer McGraw and Scozzari and whether Officer McGraw had fallen or was standing at the time he shot Scozzari. If Officer McGraw had not fallen and there were twelve to fifteen feet separating Officer McGraw and Scozzari, the use of deadly force may not have been objectively reasonable, particularly given Scozzari's lack of speed in advancing and Officer McGraw's opportunity to retreat. Moreover, the reason for the Officers' characterization of Scozzari as fleeing is not explained. The Chief testified that he observed Scozzari simply enter and remain in cabin seventeen. Thus, the Officers are not entitled to qualified immunity or summary judgment on Plaintiff's excessive force claims arising out of the shooting.

It is notable that the investigators who concluded that Scozzari was shot in self defense did not possess the Chief and Officer McGraw's reports when they examined the scene and spoke to witnesses. Also significant is the fact that it is not apparent that investigators were made aware of the trajectories of the various bullets that entered Scozzari's cabin. While Pope testified as to the trajectories at his deposition, it is not apparent that the substance of that particular testimony was ever conveyed to the investigative decisionmakers because the information is not included in Pope's report that was provided to the Court. *See* Pl. Br. Ex. 20 (Pope's report); City Br. Ex. 5 (list of materials reviewed by Clare County Prosecutor). In sum, as Plaintiff suggests, the investigative decisionmakers may not have been aware of the importance of gathering information regarding

Officer McGraw's distance from Scozzari and whether Officer McGraw was on the ground or standing when the Officers shot Scozzari.

Plaintiff also identifies what he characterizes as two separate Fourth Amendment seizures apart from the shooting. First, Plaintiff contends that during the initial encounter with Scozzari in the park, the Chief seized Scozzari in violation of his Fourth Amendment rights. "The Fourth Amendment's requirement that searches and seizures be founded upon an objective justification, governs all seizures of the person, 'including seizures that involve only a brief detention short of traditional arrest.' " *United States v. Mendenhall*, 446 U.S. 544, 551 (1980) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) (citing *Davis v. Mississippi*, 394 U.S. 721 (1969) and *Terry v. Ohio*, 392 U.S. 1, 16-19(1968))). In other words, when an officer approaches an individual, and "by means of physical force or show of authority, has in some way restrained the liberty of a citizen [such] that a 'seizure' has occurred," such conduct is only constitutional if the officer "reasonably suspected" the individual of wrongdoing. *Id.* at 552 (citations omitted).

Plaintiff emphasizes that here, Scozzari was merely walking down a public road next to a public park with a VFW building on one side of the road and the Lone Pine Motel and an apartment complex on the other side of the road. It was not a high crime area and the crime being investigated was not a property crime. The Chief quickly learned that Scozzari was carrying a cane and not a weapon. Scozzari, while unnecessarily vulgar, nevertheless made it clear that he did not wish to be disturbed and headed towards his cabin. On the basis of these facts, Plaintiff contends that the Chief had no basis on which to persist to make a stop.

Second, Plaintiff contends that the Officers seized Scozzari in violation of his Fourth Amendment rights when they attempted to arrest him by kicking in his door and ordering him out

of the cabin.  Plaintiff emphasizes that the Chief admitted that this was not a "hot pursuit" situation and he had no knowledge of emergency circumstances within the cabin.  Plaintiff asserts that the Officers had no right to enter Scozzari's home to make a routine arrest, citing *Payton v. New York*, 445 U.S. 573 (1980), and no right to enter the cabin even if they thought it was a third-party's residence, citing *Steagald v. United States*, 451 U.S. 204 (1981).  Plaintiff further contends that even if the Officers did not enter the premises, they had no right to order Scozzari from the premises in order to arrest him, citing *United States v. Sarre*, 272 F.3d 804 (6th Cir. 2001).

Beyond this, the parties have not addressed these potential Fourth Amendment claims. While Plaintiff may be able to pursue these claims, the extent to which the amended complaint encompasses them is not discussed and the Officers did not address them.  Thus, the parties will be directed to address these Fourth Amendment issues.

2

Next, the Officers contend that they are entitled to relief on Plaintiff's claims of deliberate indifference to a serious medical need.  "To sustain a cause of action under § 1983 for failure to provide medical treatment, plaintiff must establish that the defendants acted with 'deliberate indifference to serious medical needs.' " *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  In *Watkins*, the court explained that "[d]eliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the plaintiff's] health and safety." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 835-37 (1994)). "Mere negligence" is not sufficient.  *Id.*

Here, it is not disputed that the Officers knew of a substantial risk of serious harm, given that Scozzari had been shot several times.  Rather, what is disputed is whether the Officers' disregarded

that known risk. The Officers assert that "there is no evidence to suggest that delayed medical care worsened Scozzari's injuries or otherwise caused him additional harm." While the significance of that assertion is not entirely clear because the Officers do not provide any legal authority, presumably they mean to argue that any deliberate indifference by them was not the "proximate cause" of any harm, because no additional harm resulted. Nonetheless, the Officers also emphasize that they promptly reported the incident, requested an emergency medical response, and allowed the medical team to enter the scene after it was secured.

In response, Plaintiff emphasizes that there was at least a twelve minute delay between when it was first reported to dispatch that shots were fired and when the emergency medical team was able to respond to the life-threatening situation. In particular, Plaintiff contends that it was unreasonable for the Officers to take the time to solicit motel guests or residents to come view Scozzari and the weapons before allowing the emergency medical team onto the scene. Arguably, such conduct is not necessary to secure the safety of the scene.

Plaintiff cites to *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008), and *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 602-03 (6th Cir. 2005) and highlights that in the later case, the Sixth Circuit sustained a deliberate indifference to a serious medical need claim when there was a six minute delay between the time of the injury and the actual arrival of medical care. In *Owensby*, the court also found that the plaintiff did not need to prove the defendant-officers' conduct was the proximate cause of Owensby's death because the "need for medical care was obvious." 414 F.3d at 604. The court denied qualified immunity. *Id.*

In this case, the Officers are not entitled to qualified immunity or summary judgment because, viewing the facts in the light most favorable to Plaintiff, Plaintiff has raised a genuine issue

of material fact with regards to whether the Officers were deliberately indifferent to a known, life-threatening risk when they pursued a course of conduct, including the solicitation of witnesses, that resulted in a twelve-minute delay in medical care.

B

The Chief asserts that he is absolutely immune from Plaintiff's assault and battery claim because he is the highest appointive official at the pertinent level of government and his actions were taken within the scope of his authority under Mich. Comp. Laws § 691.1407(5). That statutory provision provides:

> A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority.

Mich. Comp. Laws § 691.1407(5). The Chief asserts that there is no "intent" or "gross negligence" exception to absolute immunity, citing *American Transmissions, Inc. v. Attorney General*, 560 N.W.2d 50 (Mich. 1997), and *Nalepa v. Plymouth-Canton Community School District*, 525 N.W.2d 897 (Mich. Ct. App. 1994). The Chief does not address the fact that he appears to have been acting in his capacity as an officer on patrol, rather than performing any tasks particular to his position as the "highest appointive official." Based on this circumstance, the Chief is not entitled to absolute immunity.

Both the Chief and Officer McGraw assert that they are entitled to governmental immunity for intentional torts pursuant to *Odom v. Wayne County*, 760 N.W.2d 217 (Mich. 2008) and Mich. Comp. Laws § 691.1407(2). In *Odom*, the Michigan Supreme Court explained that Mich. Comp. Laws § 691.1407(2) did not abrogate the common-law immunity that government officers enjoy for intentional torts. 760 N.W.2d at 222; *see also* § 691.1407(3) ("Subsection (2) does not alter the law

of intentional torts as it existed before July 7, 1986.").

The *Odom* court reaffirmed the test established by *Ross v. Consumers Power Co.*:

> Lower-level governmental officials and employees were afforded qualified immunity from all tort liability if they met all the following conditions: (1) the acts were taken during the course of employment and the employees were acting, or reasonably believed that they were acting, within the scope of their authority, (2) the acts were taken in good faith, and (3) the acts were discretionary-decisional, as opposed to ministerial-operational.

363 N.W.2d 641, 667-68 (Mich. 1984) (on rehearing). The good faith requirement means that "there is no immunity when the governmental employee acts *maliciously* or with a *wanton or reckless disregard of the rights of another*." *Odom*, 760 N.W.2d at 225 (emphasis in original) (footnote omitted). Here, the Officers assert that the decision of a police officer to determine the amount of force necessary to effect an arrest is a discretionary-decisional act which reflects conduct taken during the course of employment and within the scope of authority, and that there is no evidence of malice.

In response, Plaintiff states that he does not abandon his state-law claims, but given their "self-evident nature and the length of the brief" he does not discuss them. To a certain extent, the nature of Plaintiff's assault and battery claims are in fact "self-evident." Arguably, the facts that support denial of qualified immunity on Plaintiff's § 1983 claims also support denial of governmental immunity on the assault and battery claims. However, the parties do not address whether there are subtle differences between objectively unreasonable conduct that violates clearly established constitutional rights for the purposes of qualified immunity and § 1983, and conduct that constitutes reckless disregard of rights for the purposes of governmental immunity. Thus, the Court will direct the parties to provide supplemental briefing on this issue.

C

The Officers assert that while establishing that a government official's conduct amounted to "gross negligence" is a prerequisite to avoiding that official's statutory governmental immunity, "gross negligence" is not an independent cause of action. The Officers assert that the only cause of action available to Plaintiff based on the nature of his allegations is assault and battery. The Officers contend that Plaintiff cannot avoid infirmities in his assault and battery claim by attempting to frame it as a claim for gross negligence. *See VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004) (noting that the court " has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence"); *Livermore*, 476 F.3d at 408 (rejecting gross negligence claim against an officer-defendant because it was "undoubtedly premised on the intentional tort of battery" when it was based on a shooting that resulted in death). Plaintiff has not cited any legal authority to the contrary and summary judgment is appropriate on the basis of the legal authority advanced by the Officers.

D

With respect to Plaintiff's civil conspiracy claims, the Officers contend that Plaintiff has alleged facts that would suggest that a conspiracy existed to violate Plaintiff's civil rights, in contrast to Scozzari's civil rights, whose estate Plaintiff represents. The Officers emphasize that Plaintiff's allegations relate to Plaintiff's First Amendment right of access to the courts and his Fourteenth Amendment right to substantive due process. The Officers highlight that Plaintiff alleges that Defendants conspired to "conceal, distort, cover-up, ratify and condone their wrongdoings and that of others by concealment/destruction of evidence, premature investigation and feigned ignorance." Am. Compl. ¶ 54. The Officers assert that the only causes of action that have accrued to Plaintiff

have accrued by virtue of the Wrongful Death Statute, Mich. Comp. Laws § 60.2922, and are limited to those causes of action that were possessed by Scozzari at the time of his death.

Plaintiff has not cited any legal authority to the contrary and summary judgment is appropriate on the basis of the legal authority advanced by the Officers. More compelling, as will be discussed below with respect to the City and Hibl's motion for summary judgment, is the fact that Plaintiff has not advanced evidence to establish an "agreement" necessary to sustain a conspiracy claim.

IV

In their motion for summary judgment, the City and City Manager Hibl raise five primary arguments: (1) Hibl is entitled to summary judgment on Plaintiff's claims against him in his official capacity because they are claims against the City, which is a named Defendant; (2) the City is entitled to summary judgment on Plaintiff's claims of municipal liability pursuant to § 1983 because Plaintiff cannot establish a custom, policy, or practice of the City, or a failure to train by the City, leading to the violation of Scozzari's constitutional rights; (3) the City and Hibl are entitled to summary judgment on Plaintiff's civil conspiracy claims because the claims were not sufficiently plead and Plaintiff cannot establish an agreement to obstruct justice; (4) the City is entitled to summary judgment on Plaintiff's ADA claims because Plaintiff cannot establish intentional discrimination; and (5) Hibl is entitled to summary judgment on Plaintiff's claims against him in his individual capacity because Plaintiff cannot prove supervisory liability.

A

City Manager Hibl contends that Plaintiff's § 1983 official capacity claims should be dismissed against him because such claims are claims against the municipality itself, which is a

named Defendant. *See Monell v. Dep't of Soc. Servs.*, 4326 U.S. 658, 690 n. 55 (1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."). In response, Plaintiff does not address whether official capacity claims against City Manager Hibl should be dismissed. Based on the above, these claims will be dismissed to the extent that they are alleged.

B

Initially, the City asserts that if neither the Chief nor Officer McGraw's conduct violated Plaintiff's constitutional rights, there can be no municipal liability, citing *Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002), and *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Assuming a constitutional violation, the City contends that under *Monell*, 436 U.S. at 694, Plaintiff must demonstrate that an official policy or custom was "the moving force" of the constitutional violation. "[T]o satisfy the *Monell* requirements a plaintiff must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (quotations and citations omitted). Generally, unless a policy itself is unconstitutional, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (per curiam); *Board of County Comm'rs. of Bryan County, Oklahoma v. Brown*, 520 U.S. 397 (1997).

In particular, the City asserts that to succeed on a "failure to train" claim, Plaintiff must demonstrate that the municipal training program itself was so deficient that the City demonstrated deliberate indifference to the constitutional rights of citizens, citing *City of Canton v. Harris*, 49 U.S. 378, 388 (1989). The City further asserts that the fact that a particular officer may be

unsatisfactorily trained will not be sufficient to attach liability – it is the program itself that must be deficient, not the manner in which it was administered or the "trainability" of the officers who attend, citing *City of Canton*, 49 U.S. at 390-391.

Ultimately, the City contends that the fact that the Chief and Officer McGraw are certified as police officers by the State of Michigan is sufficient to defeat a failure to train claim, citing *Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997), although such a per se rule is not identified in the cited case. The City asserts that its police department has a use of force continuum policy in place that complies with Michigan Commission on Law Enforcement Standards ("MCOLES") and constitutional standards. *See* City Br. Ex. 3 (excerpts from "Policy and Procedure Manual for the Clare Police Department"). Further, the City asserts that the MCOLES training manual includes training modules in the use of force, civil rights, the ADA, and dealing with persons with mental problems and disabilities. *See* City Br. Ex. 7 (excerpts from MCOLES "Basic Training Curriculum and Training Objectives").

In response, Plaintiff asserts that such minimal training is not adequate for police officers who are likely to come into contact with individuals with mental health problems. Plaintiff contends that such "de minimus" training does not satisfy a "deliberate indifference" standard, citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046-47 (6th Cir. 1992). In *Russo*, the evidence demonstrated that the officers participated in a six to seven hour training seminar on "Disturbed-Distressed Persons." *Id.* at 1046. In light of this evidence, the court found that the plaintiffs "offered sufficient evidence to suggest that the training program . . . with respect to the use of force on mentally disturbed persons is constitutionally inadequate, that this inadequacy results from the City's deliberate indifference to the rights of such persons, and that this inadequacy may have directly

resulted in [the individual]'s death." *Id.*

Based on the limited legal authority advanced by the City, the City has not demonstrated its entitlement to summary judgment. In particular, the City has not explained how such limited training, consisting of a "module" on dealing with persons with mental problems and disabilities, is sufficient to establish that the City did not have a policy of deliberate indifference to individuals with mental health problems. There is at least a genuine issue of material fact as to whether the Officers knew, based on Scozzari's conduct and appearance, that Scozzari had mental health problems. There is also at least a genuine issue of material fact as to a causal connection between the Officers' conduct resulting in Scozzari's death and the Officers' lack of training on how to address individuals known to have mental health problems.

## C

The City and City Manager Hibl emphasize that "[i]t is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Gutierrez v. Lynch*, 826 F.2d 1534 (6th Cir. 1987). Arguably, Plaintiff did not plead the claims with sufficient specificity, however, the City and City Manager have not brought a motion to dismiss, but a motion for summary judgment. The City and City Manager assert that Plaintiff has not advanced any evidence of an agreement between the City and the County to withhold any communications, and Plaintiff has received the communication data that he requested, even if belatedly. The City and City Manager also assert that Plaintiff cannot present evidence to demonstrate that the City conspired with anyone to commit any other wrongdoing resulting in the violation of Plaintiff's rights of access to the courts or substantive due process. Indeed, Defendants are entitled to summary judgment on this claim

because Plaintiff has not advanced any evidence of an agreement.

D

On June 11, 2009, the Court granted Plaintiff leave to file an amended complaint, to alleged

a claim of intentional discrimination under the ADA. The Court explained as follows:

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To demonstrate a prima facie case under Title II of the ADA, a plaintiff must establish that "(1) [he] has a disability; (2) [he] is otherwise qualified; and (3) [he] is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of [his] disability." *Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003).

Case law addressing whether or how Title II of the ADA is applicable to police conduct related to effectuating an arrest or an investigation is limited. The courts that have determined that the ADA applies to such police actions have developed two main theories of potential liability, including a "wrongful arrest" theory, and a "reasonable accommodation" theory. A "wrongful arrest" claim generally arises when police officers have "wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity." *Gohier v. Enright*, 186 F.3d 1216, 1220 (10th Cir. 1999). *See, e.g.*, *Jackson v. Inhabitants of Sanford*, No. 94-12-P-H, 1994 WL 589617 (D. Me. Sept. 23, 1994) (denying the defendant's motion for summary judgment when the plaintiff was arrested for driving under the influence of intoxicating liquor or drugs even though the plaintiff informed the arresting officer that a brain aneurysm left him with physical disabilities that would impair his ability to perform sobriety tests). In contrast, a "reasonable accommodation" claim generally arises when police officers do not reasonably accommodate a plaintiff's disability during the course of an investigation or an arrest. *See, e.g.*, *McCray v. City of Dothan*, 169 F. Supp. 2d 1260 (M.D. Ala. 2001), aff'd in part, rev'd in part on other grounds, No. 01-15756-DD, 2003 WL 23518420 (11th Cir. Apr. 24, 2003) (denying summary judgment to the defendant when police officers did not provide the deaf plaintiff with an interpreter and refused to communicate through notes during an interrogation and arrest).

The Sixth Circuit has not explicitly addressed the "wrongful arrest" or "reasonable accommodation" theories, nor has it demarcated the reach of Title II with respect to police services. However, several cases are instructive. First, in *Johnson v. City of Saline*, 151 F.3d 564 (6th Cir. 1998), the Sixth Circuit noted the broad scope of Title II of the ADA. The court explained that the phrase, "services, programs, or activities" encompasses virtually everything that a public entity does." *Id.* at 569. The court cautioned however, that its decision "should not be read too broadly," and emphasized that "Title II only requires *reasonable* accommodation." *Id.* at 571 (emphasis in original). Additionally, *Johnson*

-40-

addressed very different factual circumstances than are present in this case; *Johnson* addressed discrimination in contracting with a public entity to provide services, not the manner in which Title II may be applicable to investigations and arrests conducted by police officers.

Several cases are more similar factually. In *Thompson v. Williamson County*, Charles Thompson, Sr., and Odessa Thompson brought suit against Officer Kenneth Gooding and Williamson County after their son was shot and killed by Officer Gooding during a confrontation in which it was undisputed that their son had threatened the officer with a machete. 219 F.3d 555, 556 (6th Cir. 2000). The Sixth Circuit found that the Thompsons' claims under Title II of the ADA failed as a matter of law because they had not produced any evidence that their son was "denied either access to a public service, or if he was, that such denial was *because of his disability*." *Id.* at 558 (emphasis in original). The court explained its rationale as follows:

> The record indicates that when the Thompsons called 911, they requested and received police assistance. Although they wanted their son taken to a medical facility, it would have still been necessary for Gooding to disarm the decedent before he could be transported anywhere. Gooding's failure to disarm, or take the decedent under control, was not because he was inadequately trained to deal with disabled individuals, but because the decedent threatened him with a deadly weapon before he could subdue him. Thus, if the decedent was denied access to medical services it was because of his violent, threatening behavior, not because he was mentally disabled.

*Id.*

Subsequently, in *Dillery v. City of Sandusky*, 398 F.3d 562 (6th Cir. 2005), the Sixth Circuit emphasized that Title II of the ADA requires a showing of intentional discrimination. There, various police officers cited the plaintiff, Kelly Dillery, on multiple occasions, for being a pedestrian in the roadway when she traveled in her wheelchair on the city streets. *Id.* at 565-66. Dillery was also charged with child endangerment, after a passing motorist reported that he thought the plaintiff had been traveling in her wheelchair in the street with a child on her lap, and that he thought the child had been hit by a mirror on his car; Dillery was acquitted of this charge after a jury trial. *Id.* at 566.

Dillery brought claims against the city under Title II of the ADA, alleging, inter alia, the city intentionally discriminated against her by stopping her because she rode her wheelchair in the street, by failing to train its officers regarding the ADA, and by failing to reasonably accommodate her. *Id.* at 567. Dillery contended that the city police "stopped, charged and harassed" her because she is disabled. *Id.* at 568. The court found that Dillery could not demonstrate intentional discrimination because the city's failure "to install handicapped-accessible sidewalks and to train its employees about the ADA affects all disabled persons, not just Dillery." *Id.* at 568. The court emphasized that "acts and omissions which have a disparate impact on disabled persons in general [are] not specific acts of intentional discrimination against [the plaintiff] in particular." *Id.* (alterations in original) (quoting *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403 (10th Cir. 1997)). The court went on to further

explain that Dillery could not establish intentional discrimination because the record showed that "[t]he police were motivated by citizen complaints of potential violations that were occurring and were not subjecting Dillery to discrimination 'solely because of her disability.' " *Id.* (quoting *Jones*, 341 F.3d at 477).

Then, in *Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008), the court once again stressed the fact that a plaintiff must be able to show intentional discrimination. The court emphasized that "the plaintiff must show that the discrimination was *intentionally* directed toward him or her in particular." 539 F.3d at 532 (emphasis in original) (citing *Dillery*, 341 F.3d at 568). The *Tucker* plaintiffs could not establish intentional discrimination when they "were arrested because they assaulted police officers, individual citizens, or attempted to interfere with a lawful arrest. . . ." *Id.* at 536. The fact that unlawful actions were taken by the *Tucker* plaintiffs was undisputed. The court went on to explain that "we rely on and expect law enforcement officers to respond fluidly to changing situations and individuals they encounter. Imposing a stringent requirement under the ADA is inconsistent with that expectation, and impedes their ability to perform their duties." *Id.* Based on that rationale, the court concluded that when "officers are presented with exigent or unexpected circumstances, it would be unreasonable to require certain accommodations be made in light of the overriding public safety concerns." *Id.*

Finally, in *Wolfanger v. Laurel County*, the Sixth Circuit affirmed the district court's grant of summary judgment to the defendants on the plaintiff's claims under Title II of the ADA, "for the reasons given in the district court's opinion." 308 F. App'x 866, 868 (6th Cir. 2009). In the district court, the plaintiff brought claims alleging that the defendants had discriminated against Lee Wolfanger "by failing to make reasonable modifications to their policies, practices and procedures to ensure his needs as an individual with a disability or a perceived disability would be met." *Wolfanger v. Laurel County*, No. 6:06-358-DCR, 2008 WL 169804, at *11 (E.D. Ky. Jan. 17, 2008). The plaintiff argued that if the defendant had "properly trained its officers in how to approach mentally ill and/or suicidal individuals, the situation would not have escalated to the point of needing to use deadly force." *Id.* Ultimately, the court found that it was not the defendant's "failure to train its officers, but Mr. Wolfanger's defiant, threatening behavior that precipitated the shooting." *Id.* It was undisputed that Mr. Wolfanger was armed with a handgun and that his wife had called 911 and stated that she was "afraid that he . . . [would] hurt himself or somebody else." *Id.* at *1-2.

Based on the above, the Court denied Plaintiff leave to amend the complaint to allege a claim based on the City's failure to train its officers under the ADA because pursuing such a claim would be futile. While Plaintiff did not remove allegations in the amended complaint with respect to a failure to train claim under the ADA, such allegations are not properly before the Court and will not be addressed. In contrast, the Court allowed Plaintiff to amend the complaint to allege intentional

discrimination because Plaintiff asserted that the evidence would show that actions were taken against Scozzari because of his disability and explained his theory of the case. While Defendants argued that the evidence would show otherwise, the Court explained that the factual dispute was not properly resolved on Plaintiff's motion to amend the complaint and the question of whether the evidence is so one-sided as to entitle Defendants to relief was a question reserved for summary judgment.

Now, the City contends that neither the Chief nor Officer McGraw had knowledge that Scozzari was disabled. In response, Plaintiff asserts that it was obvious that Scozzari was disabled based on his appearance and conduct. Plaintiff also suggests that the Officers' assertions that they did not know of Scozzari or his disabilities are belied by how well known Scozzari was in the area.

The City also contends that the Officers' actions were taken in response to Scozzari's aggressive conduct, rather than any disability. The only evidence to the contrary is Officer McGraw's testimony that when the two officers initially met up at cabin seventeen, the Chief informed him that "he had just dealt with a male that had pulled out a possible cane and threatened him . . . he . . . took cover behind a vehicle to protect himself and the male walked away and entered cabin 17. The [C]hief stated he believe that the male possibly had some mental issues." McGraw Tr. 145; Pl. Br. Ex. 13. Additionally, Jason Miller, the guest in motel room five, heard the Chief say, "he's going to jail tonight" and "something that sounded . . . like 'mental problems' or 'mental issues.' " Miller Tr. 33. This evidence does not seem to provide the necessary causal link between the Officers' alleged knowledge of Plaintiff's disability and their subsequent conduct.

In his response, Plaintiff also focuses on his contention that the Officers did not provide any accommodation to Scozzari's obvious inability to communicate. Neither party, however, explains

how Scozzari's inability to communicate could have been accommodated, or, on the other hand, why it could not have been accommodated. Based on the above, the parties will be directed to provide supplemental briefing on Plaintiff's ADA claim.

E

City Manager Hibl contends that Plaintiff's claims against him in his individual capacity should be dismissed because Plaintiff cannot demonstrate that any of Hibl's actions violated Plaintiff's constitutional rights. "A supervisory employee cannot be held liable under section 1983 for the constitutional torts of those he supervises unless it is shown 'that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.' " *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 727 (6th Cir. 1996) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). The supervisor's liability cannot be grounded solely upon a right to control employees. *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).

Hibl emphasizes that there is no evidence that Hibl either encouraged the shooting of Scozzari or that he participated in it. Hibl asserts the fact that he determined that the Chief and Officer McGraw's actions were reasonable, justified, and in accordance with departmental policy does not give rise to a constitutional violation. Finally, Hibl asserts that the fact that he did not seek *Garrity* statements from the Officers did not result in a violation of Plaintiff's rights. Plaintiff did not respond to this argument and Hibl is entitled to summary judgment based on the legal authority advanced.

V

Accordingly, it is **ORDERED** that Chief Miedzianowski and Officer McGraw's motion for summary judgment [Dkt. # 71] is **GRANTED IN PART**, **DENIED IN PART**, and **HELD IN**

**ABEYANCE IN PART**.

It is further **ORDERED** that the City and Hibl's motion for summary judgment [Dkt. # 68] is **GRANTED IN PART**, **DENIED IN PART**, and **HELD IN ABEYANCE IN PART**.  This is a final order as to Defendant Hibl only.

It is further **ORDERED** that the parties are **DIRECTED** to file supplemental briefing on the issues outlined in this opinion.  As to the Fourth Amendment issues outlined in Section III-A-1, the Officers shall file an initial brief on or before **May 4, 2010**, and Plaintiff shall file a response brief on or before **May 17, 2010**.  As to the governmental immunity issue outlined in Section III-B and the ADA issues outlined in Section IV-D, Plaintiff shall file an initial brief on or before **May 4, 2010**, and Defendants shall file response briefs on or before **May 17, 2010**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: April 21, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 21, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS