UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

STEVEN SCOZZARI, Representative
of the Estate of William Christi Scozzari,

        Plaintiff,

v.                                      Case Number 08-10997-BC
                                       Honorable Thomas L. Ludington

CITY OF CLARE, KEN HIBL, DWAYNE
MIEDZIANOWSKI, JEREMY MCGRAW,

        Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART THE
REMAINDER OF MIEDZIANOWSKI AND MCGRAW'S MOTION FOR SUMMARY
JUDGMENT, GRANTING THE REMAINDER OF THE CITY'S MOTION FOR
SUMMARY JUDGMENT, AND DENYING MIEDZIANOWSKI AND MCGRAW'S
MOTION FOR RELIEF FROM THE COURT'S PRIOR ORDER**

Plaintiff Steven Scozzari ("Plaintiff"), on behalf of the estate of his deceased brother,

William Scozzari ("Scozzari"), filed a complaint on March 7, 2008, and an amended complaint on

June 25, 2009, alleging claims arising out of the shooting death of Scozzari on or about September

18, 2007. The amended complaint alleges the following claims in separately numbered counts

against the City of Clare ("the City"), City Manager Ken Hibl ("Hibl"), City Police Chief Dwayne

Miedzianowski ("the Chief"), and Officer Jeremy McGraw ("Officer McGraw"): (1) excessive force

and deliberate indifference to a serious medical need constitutional violations pursuant to 42 U.S.C.

§ 1983; (2) municipal liability under § 1983; (3) assault and battery; (4) gross negligence under

Mich. Comp. Laws § 691.1407; (5) civil conspiracy to violate Scozzari's civil rights; and (6)

discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132.

On November 12 and 13, 2009, the City and Hibl, and the Chief and Officer McGraw

(collectively, "the Officers") filed motions for summary judgment. *See* [Dkt. # 68, 71]. On April 21, 2010, the Court granted in part, denied in part, and requested supplemental briefing as to part of each of the motions. The Officers' motion was granted in part and supplemental briefing directed as to Plaintiff's Fourth Amendment claims pursuant to § 1983, denied as to Plaintiff's deliberate indifference to a serious medical need claims pursuant to § 1983, supplemental briefing directed as to Plaintiff's assault and battery claims, and granted as to Plaintiff's gross negligence and civil conspiracy claims. Additionally, the City and Hibl's motion was denied as to municipal liability pursuant to § 1983, granted as to Plaintiff's civil conspiracy claims and all of Plaintiff's claims against Hibl, and supplemental briefing directed on Plaintiff's ADA claims.

The supplemental briefing on Plaintiff's Fourth Amendment claims against the Officers pursuant to § 1983, Plaintiff's assault and battery claims against the Officers, and Plaintiff's ADA claims against the City has been received by the Court. Also before the Court is the Officers' motion for reconsideration [Dkt. # 108]. Rather than repeat the lengthy statement of facts, the Court will adopt the statement of facts from its prior order [Dkt. # 105], found at *Scozzari v. City of Clare*, No. 08-10997, 2010 WL 1626419, at *2-11 (E.D. Mich. Apr. 21, 2010).

I

As previously mentioned, the Court directed the parties to file supplemental briefing as to Plaintiff's Fourth Amendment claims against the Officers pursuant to § 1983, Plaintiff's assault and battery claims against the Officers, and Plaintiff's ADA claims against the City. As will be explained below, the remainder of the Officers' motion for summary judgment will be granted as to Plaintiff's Fourth Amendment claims, and denied as to Plaintiff's assault and battery claims. In addition, the remainder of the City's motion will be granted as to Plaintiff's ADA claims.

## A

Plaintiff's primary Fourth Amendment claims against the Officers arose from the shooting death of Scozzari. The Court previously denied the Officers qualified immunity and summary judgment as to those claims. At the same time, the Court noted that in his response to the Officers' motion for summary judgment, Plaintiff identified what he characterized as two Fourth Amendment violations apart from the shooting. First, Plaintiff contended that during the initial encounter with Scozzari in the park, the Chief seized Scozzari in violation of his Fourth Amendment rights when the Chief sought to stop and question Scozzari. Second, Plaintiff contended that the Officers seized Scozzari in violation of his Fourth Amendment rights when they attempted to kick in his door and order him out of his cabin in order to arrest him. The Officers did not address these potential Fourth Amendment violations in either their motion for summary judgment or their reply brief, and the Court directed the parties to submit supplemental briefing.

In their supplemental brief, the Officers contend that Plaintiff's amended complaint does not contain any allegations that would have provided the Officers with notice that Plaintiff was alleging any Fourth Amendment violations apart from the shooting. In response, Plaintiff concedes that these Fourth Amendment violations were not alleged in his amended complaint. Thus, the remainder of the Officers' motion for summary judgment as to Plaintiff's Fourth Amendment claims will be granted. Whether Plaintiff should be granted leave to file a second amended complaint to include such claims will be addressed in a separate order addressing Plaintiff's pending motion to amend.

## B

With respect to Plaintiff's state-law assault and battery claims against the Officers, the Court previously found that the Chief was not entitled to absolute immunity because he was acting in his

capacity as an officer on patrol, rather than "acting within the scope of" his position as the "highest appointive official." *See* Mich. Comp. Laws § 691.1407(5). Moreover, given that the Officers were denied qualified immunity as to Plaintiff's § 1983 claims, the Court noted that the same facts would seem to support the denial of governmental immunity on Plaintiff's assault and battery claims. However, the parties did not address whether there are material differences between the standard for qualified immunity under federal law and the standard for governmental immunity under Michigan law. Thus, the Court directed the parties to file supplemental briefing.

Both the Chief and Officer McGraw assert that they are entitled to governmental immunity pursuant to *Odom v. Wayne County*, 760 N.W.2d 217 (Mich. 2008), *Ross v. Consumers Power Co.*, 363 N.W.2d 641, 667-68 (Mich. 1984), and Mich. Comp. Laws § 691.1407(2). Governmental immunity applies to intentional torts when the conduct at issue meets the following three requirements:

> (1) the acts were taken during the course of employment and the employees were acting, or reasonably believed that they were acting, within the scope of their authority, (2) the acts were taken in good faith, and (3) the acts were discretionary-decisional, as opposed to ministerial-operational.

*Ross*, 363 N.W.2d at 667-68.

The center of the dispute as to Plaintiff's assault and battery claims is whether the Chief and Officer McGraw's actions "were taken in good faith." The good faith requirement means that "there is no immunity when the governmental employee acts *maliciously* or with a *wanton or reckless disregard of the rights of another*." *Odom*, 760 N.W.2d at 225 (emphasis in original) (footnote omitted). The burden falls on the Chief and Officer McGraw to prove their entitlement to immunity. *Id.* at 227-28; *id.* at 225 ("[T]he proponent of individual immunity must establish that he acted without malice.").

The Chief and Officer McGraw emphasize that governmental immunity analysis differs from qualified immunity analysis because the former utilizes a subjective standard while the latter utilizes an objective standard. They assert that simply because an officer's conduct could be found by a jury to be objectively unreasonable, it does not necessarily follow that the officer could not have been acting in good faith. In *Odom*, the Michigan Supreme Court rejected an analysis based on "whether defendant's conduct was justified and 'objectively reasonable.' " 760 N.W.2d at 229. The court explained that "[t]he good-faith element of the *Ross* test is subjective in nature." *Id.* In other words, "[i]t protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Id.*

On this point, Plaintiff does not disagree with the Officers. Rather, Plaintiff emphasizes that the Officers have the burden of proving that they did not act "maliciously or with a wanton or reckless disregard of the rights of another." Plaintiff does not bear the burden of producing direct evidence that the Officers acted with malice. Viewing the facts in the light most favorable to Plaintiff, Defendant has not proved, as a matter of law, that the Officers acted in good faith. There is sufficient disputed evidence for the jury to reach a contrary conclusion.

While the Officers advance *Thompson v. Carrollton Twp. Police Dep't*, No. 283772, 2009 WL 1564529 (Mich. Ct. App. June 2, 2009), to illustrate that good faith can be proven even when a defendant's conduct is objectively unreasonable, the facts of *Thompson* are materially distinguishable from the facts of this case. In *Thompson*, it was "indisputably established that Thompson was still struggling to free himself, thrashing about and kicking" despite the fact that he was handcuffed and may have been "in the grasp of two officers and being pinned against a police cruiser." 2009 WL 1564529, at *2. The court concluded that "Thompson's out-of-control,

dangerous, and resistant behavior provided a basis to deploy the taser." *Id.* The court also explained that after multiple taser deployments, "Thompson would momentarily act as if he would become compliant, only to renew his physical struggle against the officers when they attempted to take control of Thompson." *Id.* It was significant that there was no evidence that the defendant "was aware . . . of literature speaking of the potential dangers associated with tasering subjects experiencing delirium," and that the taser manufacturer "had not yet distributed its bulletin warning of the need to use special care in deploying the taser, especially multiple firings against persons exhibiting excited delirium." *Id.*

In contrast, many of the facts that the Officers rely on in this case to establish that their actions were taken in good faith are disputed by Plaintiff. Despite the Officers' explanation of events, multiple witnesses testified that Scozzari was as far as ten to twenty feet from Officer McGraw, and even further from the Chief. Plaintiff also advanced evidence that Officer McGraw did not fall as he has asserted because multiple witnesses saw him shooting from a standing position, his testimony is inconsistent with his report as to when he allegedly fell, and bullets B and C entered the cabin at a slightly downward angle. There is no testimony or evidence that Scozzari was rapidly advancing toward the Officers. When these disputed facts are viewed in the light most favorable to Plaintiff, as they must be, a jury could conclude that the Officers had the ability to retreat and were motivated by malice when they instead made the decision to use deadly force on Scozzari. Unlike the taser incident in *Thompson*, it cannot be disputed that the Officers knew that firing multiple bullets at Scozzari could kill him. Thus, the Officers have not met their burden of proving their entitlement to governmental immunity and the remainder of their motion for summary judgment will be denied as to Plaintiff's assault and battery claims.

C

In its motion for summary judgment, the City argued that it was entitled to summary judgment on Plaintiff's ADA claims because Plaintiff could not establish intentional discrimination. The Court directed supplemental briefing on two issues.

First, the Court noted that it was doubtful that Plaintiff advanced enough evidence to establish the necessary causal link between Plaintiff's alleged disability and the Officers' conduct. The only evidence that appeared to suggest that the Officers' actions were taken "because of" Plaintiff's alleged disability was Officer McGraw's testimony that the Chief informed him that the man he was dealing with "possibly had some mental issues," and a motel guest heard the Chief say, "he's going to jail tonight" and "something that sounded . . . like 'mental problems' or 'mental issues.' "

In his supplemental brief, Plaintiff emphasizes that the Court previously noted, with respect to Plaintiff's municipal liability claim, that there is a genuine issue of material fact as to a causal connection between the Officers' conduct and the Officers' lack of training on how to address individuals known to have mental health problems. Plaintiff clarifies that based on this inadequate training, Plaintiff is pursuing a "wrongful arrest" ADA claim. As the Court previously explained, a "wrongful arrest" claim generally arises when police officers have "wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity." *Gohier v. Enright*, 186 F.3d 1216, 1220 (10th Cir. 1999). Thus, Plaintiff asserts that the Officers misperceived Scozzari's behavior as criminal when it was simply a product of his mental disability.

In response, the City emphasizes that for a "wrongful arrest" ADA claim to succeed, there must be lawful conduct that is perceived to be unlawful due to the individual's disability. For

example, in *Jackson v. Inhabitants of Sanford*, No. 94-12-P-H, 1994 WL 589617 (D. Me. Sept. 23, 1994), the district court denied the defendant's motion for summary judgment when the plaintiff was arrested for driving under the influence of intoxicating liquor or drugs even though the plaintiff informed the arresting officer that a brain aneurysm left him with physical disabilities that impaired his ability to perform sobriety tests. The City contends that here, there is no lawful conduct by Scozzari that was perceived to be unlawful due to any disability of Scozzari's. According to the City, Scozzari's conduct towards the Officers constituted criminal assault.

Notably, Plaintiff has not identified any lawful conduct that a disability of Scozzari's caused the Officers to misperceive as unlawful. Even if Scozzari's actions, viewed in the light most favorable to Plaintiff, do not amount to criminal assault, there is no evidence that a disability of Scozzari's caused the Officers to believe that Scozzari's actions were unlawful when they were in fact lawful. If the Officers perceived Scozzari's conduct as criminal assault, it was based on the nature of the underlying conduct, and not some way in which a disability only made the conduct appear to be unlawful. To say that Scozzari's behavior was "the product of his mental derangement" is not the same as saying that his behavior was misperceived as unlawful due to the disability. Although Scozzari could theoretically avoid criminal responsibility due to a diminished mental capacity, such a conclusion would not mean that the underlying conduct was lawful and misperceived as unlawful due to a mental disability.

Second, Plaintiff argued that the Officers did not reasonably accommodate Scozzari's inability to communicate, but neither party explained how Scozzari's inability to communicate could have been accommodated, or, on the other hand, why it could not have been reasonably accommodated. In his supplemental brief, Plaintiff suggests that the Officers should have

reasonably accommodated Scozzari's inability to communicate by "waiting and seeking others who could communicate with him." More specifically, Plaintiff insists that the Officers did not face exigent circumstances before they approached and attempted to open the door to Scozzari's cabin. Rather than contacting a mental health professional, Plaintiff asserts that the Officers unnecessarily escalated the situation and created the confrontation.

In response, the City argues that the Officers faced circumstances under which they had no duty to accommodate Scozzari's alleged disability and that the accommodations proposed by Plaintiff go beyond a "reasonable accommodation." The City emphasizes that the Officers were not aware of, and did not have contact information for, any specific individuals who could have aided them in communicating with Scozzari. In addition, the City contends that whether any such persons exist, or would have been available, is speculative and unreasonable to evaluate with the benefit of hindsight.

While the Officers may not have been aware of any specific individuals who could have aided in communicating with Scozzari, the City does not address whether the Officers could have summoned any mental health professional, not necessarily someone that knew Scozzari, that could have assisted them in deciding how to handle the situation before they decided to approach the cabin. At the point where Scozzari had entered the cabin and closed the door, it is plausible that there was time to solicit mental health assistance in the form of advice, if not a physical presence. Indeed, the Chief awaited Officer McGraw's arrival and the two had a discussion before they decided to approach the Cabin.

On the other hand, without the benefit of hindsight, it is not apparent that it was reasonably necessary for the Officers to seek the advice of a mental health professional before approaching the

cabin. Certainly, the ADA does not require that police officers contact a mental health professional any time they interact with an individual with mental health problems and there are not exigent circumstances. If Scozzari acted both verbally and physically aggressive towards the Chief, but his behavior was not so aggressive or alarming that it was unreasonable to take the time to contact a mental health professional, it would have been reasonable for the Officers to conclude that they were equipped to handle the situation without the professional assistance that a mental health professional might provide. Alternatively, if Scozzari's behavior was highly alarming, it would seem unreasonable to require the Officers to take the time to contact a mental health professional. *See Tucker v. Tennessee*, 539 F.3d 526, 536 (6th Cir. 2008) (concluding that when "officers are presented with exigent or unexpected circumstances, it would be unreasonable to require certain accommodations be made in light of the overriding public safety concerns").

Viewing the facts according to either Plaintiff's or the Officers' versions of the facts, the Officers were acting within their zone of discretion as investigating officers when they made the decision to proceed without contacting a mental health professional, or simply to proceed to handle the situation without consideration of that possibility. *See id.* (explaining that "imposing a stringent requirement under the ADA is inconsistent with th[e] expectation [that] . . . law enforcement officers . . . respond fluidly to changing situations and individuals they encounter . . . and impedes their ability to perform their duties").

Finally, the particular manner in which the Officers decided to handle the situation – forcefully opening the cabin door with tasers at the ready – could have resulted in constitutional violations; however, consideration of that question is beyond the scope of Plaintiff's "reasonable accommodation" ADA claim. While Plaintiff suggests that the Officers would not have escalated

the situation if they had been properly trained to handle individuals with mental health problems, the Sixth Circuit has rejected "failure to train" ADA claims, *see Dillery v. City of Sandusky*, 398 F.3d 562, 568 (6th Cir. 2005), and this Court denied Plaintiff's motion to amend his complaint to allege such a claim. *See* [Dkt. # 50]. Notably, Plaintiff maintains a "failure to train" claim against the City pursuant to § 1983, and the instant analysis under the ADA does not impact that claim. Based on the above, the City will be granted summary judgment on Plaintiff's ADA claims.

## II

Also before the Court is the Officers' motion [Dkt. # 108] for relief from the Court's order dated April 21, 2010. The Officers seek reconsideration of the Court's denial of their motion for summary judgment as to Plaintiff's excessive force and deliberate indifference claims arising out of the shooting death of Scozzari. To prevail on a motion for reconsideration, the moving party generally must demonstrate "a palpable defect by which the court and the parties [were] misled . . . [and] that correcting the defect will result in a different disposition of the case." E.D. Mich. L.R. 7.1(h)(3). "A 'palpable defect' is a defect that is obvious, clear, unmistakable, manifest or plain." *See United States v. Cican*, 156 F. Supp. 2d 661, 668 (E.D. Mich. 2001) (citations omitted). For the reasons stated below, the Officers' motion for reconsideration will be denied.

## A

The Officers raise what can be characterized as five main arguments concerning Plaintiff's Fourth Amendment excessive force claims. First, the Officers challenge the Court's conclusion that there exists a genuine issue of material fact as to the distance between the Officers and Scozzari when the Officers shot Scozzari. Defendant asserts that "[t]he relevant inquiry is not what distance a witness perceived but, rather, whether Defendants reasonably believed that they (or the other

officer) were in danger of harm." The Officers also emphasize that "minor discrepancies in testimony do not create a material issue of fact."

The Officers have not advanced any arguments to undermine the earlier conclusion that conflicts in testimony were "more than minor as to the distance between Officer McGraw and Scozzari" when the Officers' testimony was that the distance was only three to five feet and other witnesses testified that the distance was as great as ten to twenty feet. In addition, the witnesses' perception of the distance may be probative of whether the Officers reasonably believed that they were in danger and whether the use of deadly force was constitutionally justified. If a jury were to find the witnesses' testimony to be credible, the Officers' testimony that they believed that they were in danger, and that the use of deadly force was necessary, could be undermined.

Second, the Officers argue that whether Officer McGraw was standing when the Officers fatally shot Scozzari is immaterial to whether the use of deadly force was objectively reasonable. They assert that the only material facts are that Scozzari was holding weapons, disobeying the Officers' orders to drop the weapons, and advancing toward the Officers. While the Officers recognize that if Officer McGraw was standing he could have more easily retreated from the situation, they seek to emphasize that the Officers had no "duty to retreat."

The Officers had a constitutional obligation to not use excessive force, and all of the factual circumstances must be taken into account to evaluate the reasonableness of the use of deadly force. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."). If Officer McGraw was on the ground, and thus immobile, it becomes more reasonable to conclude that Scozzari posed an "immediate threat" to the Officers. However, the corollary is also true; if Officer

-12-

McGraw was on his feet and easily able to move, it becomes more difficult to conclude that Scozzari posed an immediate threat. *See id.* ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). Undoubtedly, if the Officers' version of the facts ultimately prevails – that Scozzari was three to five feet from a fallen Officer McGraw and wielding knives in a threatening manner – the use of deadly force would likely be reasonable given that Scozzari would have posed an "immediate threat" to Officer McGraw.

However, viewing the facts in the light most favorable to Plaintiff, if Scozzari was ten to twenty feet from a standing Officer McGraw, the use of deadly force would have been objectively unreasonable, particularly in light of the fact that the Officers were not "backed up against a wall" without a "ready means of retreat or escape." *See Chappell v. City of Cleveland*, 585 F.3d 901, 911 (6th Cir. 2009). To say that the use of deadly force was not justified in light of all of the relevant factual circumstances is not the same as saying that the Officers had a "duty to retreat." Whether the Officers had the option of taking a few steps back to address their safety concerns is simply one factual circumstance that must be considered to evaluate whether the use of deadly force was reasonably necessary to protect the Officers and other individuals. Similarly, despite the Officers' suggestion otherwise, the type of weapon that Scozzari was holding must be considered. Had he been holding a gun, instead of a knife or hatchet, with or without a sheath, whether the distance between Scozzari and the Officers was three feet or twenty feet would be a lot less meaningful.

The Officers also challenge whether witness testimony and expert analysis of the trajectory of the bullets suggesting that Officer McGraw did not fall creates a genuine issue of material fact as to whether Officer McGraw had fallen or was standing when he shot Scozzari. While the Officers

contend that "it is simply improper to rely upon a lack of eye witness testimony of McGraw on the ground to prove the positive assertion that McGraw was standing when he shot Scozzari," the conclusion did not rely on a lack of eye witness testimony. Wanetta Gibbons testified that both Officers were standing and about fifteen feet from Scozzari when they shot Scozzari. Gibbons Tr. 44, 78-79, Oct. 24, 2008. Jeff Richardson testified that Officer McGraw was standing for some time before and when he shot Scozzari, that the Officers never left his sight, and that he never saw Officer McGraw fall. Richardson Tr. 50, 55-56, Jan. 16, 2009. Also, Jeff Morgan II testified that he saw Officer McGraw shoot Scozzari while he was standing and never saw Officer McGraw fall. Morgan II Tr. 57, July 27, 2009.

Finally, the Officers contend that the testimony of Michigan State Police ballistics technician Reinhart Pope does not create a genuine issue of material fact despite the fact that it supports the conclusion that Officer McGraw was standing when he shot at Scozzari. The Officers contend that the downward trajectory of the bullets is not necessarily attributable to the fact that Officer McGraw was standing when he shot Scozzari. For example, the Officers suggest that there is evidence to support the proposition that Officer McGraw may have shot Scozzari from a location with a higher elevation than where Scozzari was standing. In addition, the trajectory of some of the bullets may have been altered when they passed through Scozzari's body. The fact that there may be competing explanations for the trajectory of the bullets does not undermine the conclusion that there is a genuine issue of material fact as to whether Officer McGraw was standing when he shot Scozzari. Pope's testimony that the angles at which the bullets entered the cabin were "consistent with the bullet having been fired by . . . a person standing," combined with eye witness testimony that Officer McGraw was standing, is sufficient to demonstrate a genuine issue of material fact.

Third, the Officers contend that the Court incorrectly noted that Scozzari was advancing on Officer McGraw with a "lack of speed." Yet, the Officers do not point to any evidence, their own testimony or otherwise, that suggests that Scozzari was moving quickly. Rapid movement by Scozzari – for example, running, charging, lunging – was not recorded in the Officers' reports, advanced through their deposition testimony, or advanced by the Officers through other evidence. In significant contrast, the Chief reported that Scozzari began "walking" toward the Officers after standing at the threshold of the cabin for some time. Pl. Br. Ex. 13 (incident report). *See also* Chief Tr. 103-05, June 30, 2009 (explaining that it may have been "a couple minutes" before Scozzari advanced out the door and took "a couple steps" beyond the sidewalk). Nothing advanced by the Officers suggested that Scozzari was "walking" at an abnormally fast pace. Even if such evidence were advanced, it would be unlikely to resolve Scozzari's rate of speed as a matter of law in light of the Chief's statement in the incident report that Scozzari was simply "walking." *Cf. Chappell*, 585 F.3d at 905 (suspect was moving quickly towards the officers).

Fourth, the Officers seek to emphasize that "what investigating officers knew, and when they knew it, is immaterial to the determination of whether Defendants' use of deadly force was objectively reasonable." Notably, the Court's prior opinion did not suggest that such information was material to the question of whether the Officers' use of deadly force was reasonable. The Court merely noted that if the investigators who concluded that the shooting of Scozzari was self-defense and justifiable homicide did not have the same evidence before them as will be presented to a jury in this case, such a circumstance would help to reconcile why a reasonable jury could reach a different conclusion than that reached by the investigators.

Fifth, the Officers contend that Plaintiff cannot maintain his excessive force claim against

the Chief because none the Chief's bullets hit Scozzari. They cite legal authority for the proposition that an individual is not "seized" by an officer within the meaning of the Fourth Amendment until the individual yields to a show of authority. Thus, they contend that Scozzari was never seized by the Chief because none of the Chief's bullets caused Scozzari to yield. In response, Plaintiff cites legal authority for the proposition that an officer who participates in a shooting can be found liable for a resulting constitutional deprivation even when it is not his bullet that subdues a suspect. Importantly, this issue was not raised in the Officers' motion for summary judgment, and is not properly reviewed on a motion for reconsideration. Motions for reconsideration "are aimed at *re*consideration, not initial consideration." *Sault St. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) (quotation omitted); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

<center>B</center>

Next, the Officers contend that they are entitled to summary judgment on Plaintiff's deliberate indifference to a serious medical need claims because a reasonable jury could not conclude that there was a twelve minute delay between when Scozzari was shot and when the emergency medical technicians ("EMTs") were able to approach Scozzari to render aid. Two documents provide insight as to the timeline of events related to an emergency medical response after Scozzari was shot – a Clare Police Department incident report [Dkt. # 82-2] and a mobile medical response ("MMR") patient care report [Dkt. # 84-6]. Significantly, neither Plaintiff nor the Officers have offered any testimony or other instructions from an authoritative source (e.g., the respective creators of the reports) regarding how to read or interpret the reports. Rather, each side relies on the respective interpretations of its legal counsel.

During the time period from when Scozzari was shot to when the MMR unit was enroute to the hospital with Scozzari, the Clare Police Department Report provides the following information:

| TIME | EVENT |
| --- | --- |
| 23:26:08 | 1815[1] DISP. McEwan/Wilcox Pkway, Clare |
| 23:26:09 | SHOTS FIRED/SUSPECTS DOWN |
| 23:27:13 | 1831[2] DISP. McEwan/Wilcox Pkway, Clare |
| 23:27:42 | 46-1[3]  10-7 |
| 23:27:44 | 46-4[4]  10-7 |
| 23:28:46 | GOYT[5] ENRT. |
| 23:28:49 | 1815 ENRT. |
| 23:28:51 | 1815 ENRT. |
| 23:29:28 | PER 46-1, CONTACT MMR/HAVE THEM STATE AT PETIT PARK/CONTACT MSP, HAVE THEM CONTACT COMMANDER AND HAVE THEM HANDLE IT/CONTACT SHERIFF, CONTACT HIS STAFF AND CITY MANAGER |
| 23:30:17 | 1831 ENRT. |
| 23:31:02 | CITY MGR/KEN HIBL/NOTIFIED |
| 23:31:06 | KOLHOFF[6] NOTIFIED |
| 23:32:23 | 501[7] ENRT TO STAGE |
| 23:33:53 | SAAD NOTIFIED |
| 23:33:54 | LONE PINE CABIN 17/NE CORNER NEAR MCEWAN/WILCOX PKWY |
| 23:34:22 | 18-1 DISP. McEwan/Wilcox Pkway, Clare |

---

[1]  1815 refers to Kyle Michael Kehn.

[2]  1831 refers to Daniel Patrick Kennedy.

[3]  46-1 refers to the Chief.

[4]  46-4 refers to Officer McGraw.

[5]  GOYT refers to Jeffery Vincent Goyt.

[6]  Kolhoff refers to Greg Kolhoff.

[7]  It is not apparent to what 501 refers.

| | |
|---|---|
| 23:34:50 | SEND IN ALPHA UNIT PER 46-1 |
| 23:34:53 | 1815  10-7 |
| 23:37:10 | 1815  10-7 |
| 23:39:45 | 18S4[8] DISP. McEwan/Wilcox Pkway, Clare |
| 23:40:56 | 46-2[9] DISP. McEwan/Wilcox Pkway, Clare |
| 23:40:59 | 46-2 ENRT. |
| 23:41:03 | 18S4  10-7 |
| 23:41:54 | 18-1 ENRT. |
| 23:46:44 | 6309[10] DISP. McEwan/Wilcox Pkway, Clare |
| 23:46:47 | 6309 ENRT. |
| 23:48:30 | 18-1  10-7 |
| 23:51:34 | 6309  10-7 |
| 23:52:54 | Babcock notified and enrt |
| 23:53:23 | 46-8 DISP. McEwan/Wilcox Pkway, Clare |
| 23:57:32 | 1815 ENRT. CLARE ER/FOLLOWING MMR UNIT |

The MMR patient care report provides:

| | | |
|---|---|---|
| **Recvd:** | 23:27 | 09-18-07 |
| **Dispatch:** | 23:27 | 09-18-07 |
| **Enroute:** | 23:28 | 09-18-07 |
| **At patient:** | 23:35 | 09-18-07 |
| **At scene:** | 23:33 | 09-18-07 |
| **Transport:** | 23:56 | 09-18-07 |
| **At dest.:** | 23:58 | 09-18-07 |
| **Partially Avail:** | 23:58 | 09-18-07 |
| **Available:** | 23:58 | 09-18-07 |

---

[8]  18S4 refers to Jennifer Lynne Tilson.

[9]  46-2 refers to Greg Kolhoff.

[10]  6309 refers to James Abel.

The Officers contend that the incident report demonstrates that the shots fired were reported at 23:26:09, that emergency medical help was dispatched at 23:27:13, and that the MMR unit was enroute at 23:28:46 and still enroute at 23:30:17. The Officers assert that this is consistent with the patient care report, which demonstrates that the MMR unit received the call and was dispatched at 23:27, was enroute at 23:28, on the scene at 23:33, and at the patient at 23:35. Thus, the Officers contend that there was at most a two minute delay from 23:33 to 23:35, while the Officers were securing the scene. They assert that there is no evidence to suggest that any delay occurred because they were soliciting witnesses.

The Officers' explanation of the incident and patient care report is incomplete. They do not explain who reported shots fired or requested emergency medical help, but more importantly, they do not explain the basis for their assertion that emergency medical help was dispatched at 23:27:13. The line entry for that time provides: "1831 DISP. McEwan/Wilcox Pkway, Clare." While the number 1831 refers to Daniel Patrick Kennedy, the Officers have not provided any information about that individual, such as whether he was an EMT. Indeed, Plaintiff asserts that Mr. Kennedy is a county deputy.

Moreover, the Officers' interpretation of the incident report is potentially inconsistent internally, because the report clearly states that the Chief notified dispatch at 23:29:28 to "contact MMR," and "have them stage at Petit Park." As Plaintiff suggests, this raises the possibility that the Chief did not request emergency medical help until 23:29:28, 3 minutes and 17 seconds after the report of shots fired. Although it is not inconceivable that the Chief himself reported the shots fired at 23:26:09 and requested emergency help at that time, or that emergency medical help is automatically dispatched when there is such a report, the Officers have not expressed that point of

view, nor explained why any of that information would not have been recorded within the incident report. A reasonable jury could conclude that the Officers unreasonably delayed in requesting emergency medical help by waiting over three minutes in a life-threatening situation.

While the Officers rely on the patient care report to demonstrate that the MMR unit received the call and was dispatched at 23:27, was enroute at 23:28, on the scene at 23:33, and at the patient at 23:35, the report further records that "scene delay" was caused by "law enforcement." In addition, "assessments" of Scozzari's condition appear to have been recorded by EMT Nate Kunik at 23:38:00 with a notation that "Assessment initially delayed due to restricted access to pt.. (crew directed by PD to approach pt without disturbing evidence)." While the Officers suggest that no delay was caused due to their solicitation of witnesses, that conclusion cannot be reached as a matter of law at this juncture.

To this point, no evidence suggests that the Officers only solicited witnesses while awaiting the arrival of emergency medical help. It is undisputed that the MMR unit was required to stage off scene, and multiple witnesses, including Officer McGraw, testified that individuals were asked to come view the fallen Scozzari. A reasonable jury could conclude that such conduct at least contributed both to the time that the MMR unit was required to stage off scene and the delay in Scozzari receiving medical help. While part of the time period between 11:26:09 and 11:38:00 is certainly attributable to the time necessary for the MMR unit to depart for and travel to the scene of the shooting, a reasonable jury could conclude that at least three minutes of delay was due to the Officers' delayed request for emergency medical help on the front end and at least three minutes of delay was due to the Officers' solicitation of witnesses to view the fallen Scozzari on the back end. Thus, the Officers are not entitled to summary judgment on Plaintiff's deliberate indifference to a

serious medical need claims.

<center>III</center>

Accordingly, it is **ORDERED** that the remainder of Chief Miedzianowski and Officer McGraw's motion for summary judgment [Dkt. # 71] is **GRANTED IN PART** and **DENIED IN PART**. This order terminates the motion, but does not terminate any individual's party status.

It is further **ORDERED** that the remainder of the City's motion for summary judgment [Dkt. # 68] is **GRANTED**. This order terminates the motion, but does not terminate any individual's party status.

It is further **ORDERED** that Chief Miedzianowski and Officer McGraw's motion for relief from this Court's prior order [Dkt. # 108] is **DENIED**.

<div align="right" style="margin-left:40%">
s/Thomas L. Ludington _____

THOMAS L. LUDINGTON
United States District Judge
</div>

Dated: June 29, 2010

<div style="border:1px solid; width:50%; margin:auto; text-align:center">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 29, 2010.

s/Tracy A. Jacobs _____
TRACY A. JACOBS

</div>