UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

STEVEN SCOZZARI, as Personal
Representative of the Estate of WILLIAM
CHRISTI SCOZZARI, Deceased,

                       Plaintiff,                           Case No. 08-10997
                                                   Honorable Thomas L. Ludington
v.

CITY OF CLARE, a municipal corporation;
KEN HIBL, a municipal agent of City of Clare;
CHIEF DWAYNE MIEDZIANOWSKI, as an
agent for the municipal corporation and as an
individual; OFFICER JEREMY McGRAW, as
an agent of the municipal corporation, and as an
individual, jointly and severally,

                       Defendants.

_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR RELIEF,
DENYING PLAINTIFF'S RENEWED MOTION FOR A NEW TRIAL, AND DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

      William Scozzari died from gunshot wounds after an altercation with Clare City Police

Officers just before midnight on September 18, 2007.  The Officers, Defendants Dwayne

Miedzianowski and Jeremy McGraw, fired upon Scozzari as he approached them armed with a

hatchet in one hand and a knife in the other.  Scozzari's brother, Plaintiff Steven Scozzari,

subsequently brought suit against the Officers, as well as Defendants City of Clare and Ken Hibl.

A trial commenced on June 19, 2012, but not before Hibl and a number of Plaintiff's claims were

dismissed.  The trial concerned Plaintiff's claims that the Officers used excessive force on

Scozzari and then denied him timely medical care, along with Plaintiff's claim that the City

caused the excessive force violation through an official policy or failure to train the Officers.

After nine days of trial and three days of deliberation, the Jury returned a finding of no liability on all counts.

Plaintiff then brought a motion for a new trial, asserting that the following were errors: (1) the Court's refusal to give Plaintiff's Fourth Amendment Excessive Force instruction; (2) the Court's responses to Jury questions two and three; (3) the Court's refusal to provide Plaintiff's requested instruction regarding "necessity" and "ability to retreat" factors; and (4) the Court's instruction involving "proximate cause" as an element of Plaintiff's denial of timely medical care claim. The motion was granted in part — Plaintiff does not have to prove proximate cause in order to recover on his adequate medical care claim. A new trial is forthcoming concerning only Plaintiff's claim that Defendants McGraw and Miedzianowski denied Scozzari timely medical care in violation of his Fourteenth Amendment rights.

Pursuant to Federal Rule of Civil Procedure 60, Defendants Miedzianowski and McGraw moved for relief from the Court's Opinion & Order granting the new trial. The Officers argue that even if the Court's proximate cause instruction was error, no reasonable jury could find that they were deliberately indifferent to Scozzari's medical needs. On December 11, 2012, the Court directed a response from Plaintiff by the end of the month.

Plaintiff responded on December 31. While filing his response to the Officers' motion, Plaintiff brought two of his own. He renewed his motion for a new trial as it concerned the excessive force claim, and he filed a motion for summary judgment regarding the timely medical care claim. Plaintiff's two additional motions raise issues that have been previously decided on the merits — and the motions will be denied. As discussed below, the Officers' motion for relief will be denied as well.

**I**

The following factual recitation is nearly identical to that contained in the Court's November 11, 2012 Opinion & Order addressing Plaintiff's motion for a new trial. Because the three motions currently pending before the Court implicate the same events, it is provided below for the convenience of the reader.

**A**

William Scozzari lived alone in Cabin 17 at the Lone Pine Motel for years. The Lone Pine Motel is a collection of two-story buildings and stand-alone cabins offering overnight stays and extended lodging. A diagnosed schizophrenic, people thought Scozzari odd, but he kept to himself and generally did not cause trouble.

During the evening of September 18, 2007, Chief Miedzianowski was doing paperwork at the Clare City Police Department. As the Chief of police, only part of his job involves active patrols. But just after 11:00 p.m., a call came in from a resident at the Lone Pine Motel that shots had been fired in a nearby park. Only a few minutes away, Miedzianowski went to investigate.

At 11:12 p.m. Miedzianowski arrived near the Lone Pine, turned off his cruiser, and listened. He heard nothing, but noticed a man walking from the nearby VFW Hall carrying a flashlight and a cane. It was Scozzari, presumably on his way back to Cabin 17. Scozzari peaked Miedzianowski's curiosity when he shined his flashlight on Miedzianowski's police cruiser. Miedzianowski requested that Scozzari stop and talk, but Scozzari responded, "Fuck you, boy," and walked on. Suspicious, Miedzianowski got out of his car and followed on foot.

They eventually walked through the Lone Pine parking lot in front of a number of free-standing cabins, including Scozzari's. Miedzianowski, in full police uniform, identified himself as an officer and ordered Scozzari to halt. Again he was met with "Fuck you." This time,

Scozzari turned around, and only ten feet from Miedzianowski, cocked his cane back over his head as if to strike. Miedzianowski ordered him to drop the cane while backing away a few steps. He attempted to subdue Scozzari with pepper spray, but to no apparent effect. Bringing the cane down to his side, Scozzari then reached to his belt and began removing what appeared to be a long knife. Miedzianowski drew his police revolver and retreated around a truck. He ordered Scozzari to "drop his weapons," but Scozzari did not comply. Instead, Scozzari turned, walked into Cabin 17, and closed the door behind him.

Meanwhile, Officer McGraw had been dispatched to the scene. He was the only Clare City Police Officer on patrol that night, and he had spent the previous hour breaking up a fight a few miles away. McGraw arrived at the Lone Pine around 11:21 p.m., reported his arrival to dispatch, and then parked his cruiser to search for Miedzianowski. He found Miedzianowski in the parking lot in front of Cabin 17. Miedzianowski relayed that Scozzari had assaulted him and was holed up in a cabin. Miedzianowski, the ranking officer at the scene, told McGraw that Scozzari may have mental issues, but needed to be apprehended.

Miedzianowski and McGraw then converged on Scozzari's cabin. McGraw approached the right side of the door with his taser at the ready. Miedzianowski covered him from a few steps away with drawn revolver. McGraw knocked on the door and said, "Police. Open up." There was no response, so McGraw banged louder. Then the door opened, and Scozzari appeared clutching a knife and a hatchet in his hands. McGraw retreated as Scozzari took a step forward, and Miedzianowski yelled "Drop your weapons! Drop your weapons!" McGraw testified that he was scared he was going to die. He fired the taser, which launched harpoon probes at Scozzari, but the probes missed. Scozzari then stepped back inside his cabin and slammed the door.

Reacting quickly, McGraw kicked the door, but it did not move. Miedzianowski moved up and kicked the door as well, but it still did not fly open as they intended. Instead, Scozzari opened the door on his own. Brandishing a hatchet in his left hand and a knife in his right, Scozzari advanced on McGraw. Miedzianowski and McGraw both screamed "Drop your weapons!" One witness claimed he heard the phrase twenty or thirty times. As Scozzari approached, McGraw backed away. Although disputed, McGraw and Miedzianowski testified that McGraw fell to the ground, and that Scozzari moved as close as five feet, menacing McGraw with his blades. Scrambling backwards, McGraw threw his taser aside and reached for his gun. Miedzianowski, believing that McGraw was helpless and in very real danger, opened fire. Getting to his feet, McGraw brought his weapon to bear as well. Eleven shots were fired in all.

Five bullets penetrated Scozzari's body as he twisted and fell to the ground. One bullet, causing "the fatal wound," cut through the carotid artery in Scozzari's neck, his trachea, the right subclavian artery in his chest, his thoracic aorta, and finally lodged in his left lung. Plaintiff's Forensic Pathologist, David Allen Start, testified at trial that the damage would have cut the blood flow to Scozzari's brain and he would have been unconscious in seconds. According to Dr. Start, the injuries were lethal, creating a very high likelihood of death even if they occurred in a hospital setting.

As Scozzari lay on the ground, McGraw and Miedzianowski continued to scream "Drop your weapons!" They believed that he could be feigning injury to lure them closer. McGraw then cautiously approached Scozzari's body, stepped on his wrists, and threw his weapons aside. He then handcuffed Scozzari's hands together in front of his body. Blood was pooling around Scozzari, and it was apparent to both Officers that his condition was serious.

Two eye-witnesses testified that within seconds, Miedzianowski grabbed his shoulder radio and called for help. Winifred Bryans, an off-duty Emergency Medical Services (EMS) provider, testified that she heard Miedzianowski's call over her radio around 11:27 p.m. She claimed he asked for everybody — that shots had been fired and a man was down. Bryans and her husband left in their emergency response vehicle and sped to the scene. While it was debated at trial how quickly Miedzianowski and McGraw responded to Scozzari's medical needs, dispatch lists an indisputable call from Miedzianowski at 11:26:09 p.m. — SHOTS FIRED/SUSPECTS DOWN — less than five minutes after McGraw arrived at the scene. The dispatch log indicates that three minutes later, while emergency vehicles were en route, Miedzianowski instructed dispatch to "stage" the emergency responders a block away. Staging is ordinary procedure for emergency medical responders, where they wait to enter a scene until it is fully secured.

The EMT log from that night establishes that Nathan Kunic and Stacy Salminen, the on-duty responding paramedics, were dispatched at 11:27 p.m., arrived on scene at 11:33 p.m., and then staged as instructed. Another controversial point during the trial was how long Miedzianowski and McGraw waited until they indicated the area was safe for medical personnel to enter. The EMT log shows that Kunic and Salminen were at Scozzari's body by 11:35 p.m., as was Bryans, who had arrived to assist. So while emergency responders were forced to stage, it was at most two minutes. Further, a portion of that time was dedicated to readying equipment and transporting it to where Scozzari lay some distance away. Upon reaching Scozzari's body, Kunic noted that he did not have a pulse, was not breathing, and showed no signs of neurological activity. Scozzari's body was then loaded onto a gurney and transported to a nearby hospital, where he was pronounced dead on arrival.

- 6 -

**B**

Plaintiff filed two lawsuits related to the incidents of September 18, 2007. The first is the present case against Defendants Miedzianowski, McGraw, City of Clare, and Hibl.  The second case was against only Miedzianowski and McGraw pursuant to 42 U.S.C. § 1983.  Commonly referred to as "Scozzari II," the case involved allegations against Miedzianowski and McGraw for illegal detention, unreasonable seizure, and excessive force in violation of Scozzari's Fourth Amendment rights.  Unlike this case, Scozzari II involved only the actions leading up to the fatal shooting.  The complaint alleged Miedzianowski's use of pepper spray in the parking lot was excessive force, and that Scozzari was unreasonably seized when Miedzianowski ordered him to drop his cane.  The complaint also claimed both Miedzianowski and McGraw committed an unreasonable seizure when they positioned themselves outside of Scozzari's cabin in order to arrest him, demanded that he come out, and attempted to force their way in.  But because Scozzari never submitted to the Officers' authority, he was not seized, and because he was not seized, no excessive force could have been applied.  Scozzari II was dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief.  On September 14, 2012, the Sixth Circuit affirmed that decision.  *See Scozzari v. McGraw*, 11-1689, 2012 WL 4039753 (6th Cir. Sept. 14, 2012).

The instant case also involved a Sixth Circuit appeal.  Officers Miedzianowski and McGraw filed an interlocutory appeal concerning this Court's determination that they were not protected by qualified immunity for the events surrounding the shooting itself.  That decision was also affirmed.  *See Scozzari v. Miedzianowski*, 454 F. App'x 455 (6th Cir. 2012).

The trial took place over nine days between June 19 and July 3, 2012.  The Jury was tasked with determining whether the Officers had violated Scozzari's Fourth and Fourteenth

- 7 -

Amendment rights, in addition to whether the City of Clare had influenced their actions with an official policy or lack of training. Plaintiff's claims against Hibl were dismissed, and were not a part of the proceedings. Jury deliberations began on the final day of trial, July 3, and continued on July 5 and 6. On the morning of July 5, one of the jurors appeared to suffer a heart attack, and was taken to the hospital. An alternate was brought in, the other jurors briefed her on the status of deliberations, and the Jury pressed on.

Applying the Sixth Circuit's segmented approach to excessive force cases, the Court established that the events leading up to the confrontation at Scozzari's cabin door were not a part of the "totality of circumstances" for the Jury's determination. Instead, the Jury was directed to the events that occurred at the door of Cabin 17 and those that followed to determine whether the Officers had employed excessive force. Additionally, in order to find that the Officers had denied Scozzari timely medical care, the Jury was instructed that Plaintiff must show any indifference on the Officers' part proximately caused Scozzari's death.

Late on July 5, the Jury delivered the following note to the Court: "We have not reached unanimous verdict on all questions, and are unable to agree on I.1 and II.1. Our assessment is that our deliberations have been exhausted and will not reach unanimous verdict on these two points." Pl.'s Mot. New Trial Ex. 1, ECF No. 209. Points I.1 and II.1 refer to the verdict form questions concerning the Officers' alleged use of excessive force. Plaintiff moved for a mistrial, which was denied. Instead, the Court responded with a supplemental jury instruction encouraging the jurors to continue their deliberations, but reminding them it was important to reach unanimous agreement "honestly and in good conscience." Supp. Jury Inst. 2, ECF No. 206.

While the Court and the attorneys discussed how to respond to the Jury's first question, the Jury presented a second regarding the "totality of the circumstances" they were to consider in assessing the excessive force issue:

> There is irreconcilable difference amongst us wheather [sic] excessive force was employed in the events preceding the shooting.  <u>If we are to consider the use of force in all of these preceding events, we think we will be unable to agree.  We are asking for clarification regarding the meaning of the word "totality."  Are we to consider the use of force in all the preceding events, or only in the instant of the shooting.</u>

Pl.'s Mot. New Trial Ex. 2 (emphasis in original). The Court responded as follows:

> You have asked a question concerning our instructions on the use of force and the question of whether it was objectively reasonable in light of the totality of the circumstances.  The circumstances we are referring to are the circumstances at the door of Cabin 17 on September 18, 2007 and the officers' observance of William Scozzari, and not the events that preceded that circumstance.

Pl.'s Mot. New Trial Ex. 3.  Later that day, the Jury returned with a third question:

> Please provide us more clarification as we consider events that occurred "at the door." Are we to consider the use of force involved in kicking in the door, or after Mr. Scozzari has exited the cabin?

Pl.'s Mot. New Trial Ex. 5.  Plaintiff again moved for a mistrial, and was again denied.  The Court responded to the Jury:

> While you may consider the events that occurred in close temporal proximity to the officers' decision to use lethal force in determining the objective reasonableness of the officers' actions, the question framed for you only relates to the officers' decision to use lethal force.

Pl.'s Mot. New Trial Ex. 6.  Shortly thereafter, the Jury returned a unanimous verdict.  It found that both Miedzianowski and McGraw were not liable for using excessive force in violation of Scozzari's Fourth Amendment rights, and that both men were also not liable for deliberate indifference to Scozzari's medical needs in violation of his Fourteenth Amendment rights.

Because the Jury found that no excessive force was used, there was no need to entertain the possibility that the City of Clare's official policy or a lack of training caused the conduct, and the City was also found not liable. Judgment was entered on July 26, 2012.

## C

Three weeks after judgment was entered, Plaintiff moved for a new trial, alleging four sources of error. While the Court found the first three unpersuasive; Plaintiff was granted a new trial concerning the fourth. The Court's instruction involving "proximate cause" as an element of Plaintiff's denial of timely medical care claim was error, and Plaintiff will have another opportunity to demonstrate the Officers denied Scozzari timely medical care.

The Officers sought relief from the Court order granting a new trial, and they renewed their motion for judgment as a matter of law on the issue. Plaintiff responded to the Officers' motion, and filed two others: a renewed motion for a new trial on the excessive force claim, and a summary judgment motion as to the Officers' liability concerning the timely medical care claim. Each is addressed in turn.

## II

The first issue is Defendants Miedzianowski and McGraw's motion for relief and renewed motion for judgment as a matter of law concerning Plaintiff's timely medical care claim. The Officers believe the jury instruction that included proximate cause as an element Plaintiff must prove was not erroneous, and even if it was, argue that no reasonable jury could find for the Plaintiff on the issue. The Officers are ultimately unpersuasive, and their motion for relief and judgment as a matter of law will be denied.

## A

Federal Rule of Civil Procedure 60(b) permits a court to relieve a party from any final judgment or order because of, among other things, "mistake, inadvertence, surprise, or excusable

neglect." Fed. R. Civ. P. 60(b)(1).  The Officers contend that the Court's November 7 Opinion & Order granting Plaintiff a new trial on his timely medical care claim was legal error.  A claim of strictly legal error falls in the category of "mistake" under Rule 60(b)(1).  *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989).

Additionally, Federal Rule of Civil Procedure 50 permits a motion for judgment as a matter of law if a party has been fully heard on an issue.  *See* Fed. R. Civ. P. 50(a)(1).  The motion may be made at any time before a case is submitted to the jury.  Fed. R. Civ. P. 50(a)(2).  If the court finds "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," the court may resolve the issue against the party and grant the motion for judgment as a matter of law.  Fed. R. Civ. P. 50(a)(1)(A–B).  If a Rule 50(a) motion is made during trial but denied, "the movant may file a renewed motion for judgment as a matter of law," generally no later than 28 days after the entry of judgment.  Fed. R. Civ. P. 50(b).

In short, "[j]udgment as a matter of law is appropriate when 'viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party.' " *Tisdale v. Federal Exp. Corp.*, 415 F.3d 516, 527 (6th Cir. 2005) (quoting *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004)).  Although a renewed motion for judgment as a matter of law must be filed within 28 days after the entry of a judgment, Fed. R. Civ. P. 50(b), the restriction does not apply here where the Officers prevailed at trial and had no reason to renew their motion until entry of the Court's November 7, 2012 Opinion & Order.  Upon entry of that Opinion, the Officers timely filed their motion on December 3, 2012.

**B**

The Officers set forth three reasons to establish that they are entitled to judgment as a matter of law on Plaintiff's adequate medical care claim, and conclude they should be relieved of

- 11 -

the Court's November 7 Opinion & Order.  The Officers argue that: (1) there is not a sufficient evidentiary basis to find they were deliberately indifferent to Scozzari's serious medical needs; (2) they are entitled to qualified immunity on the issue; and (3) in order to recover, Plaintiff should be required to prove any indifference by the Officers proximately caused Scozzari's death.  All three points are without merit.

### 1

The Officers first claim that there is not sufficient evidence for a jury to find they were deliberately indifferent to Scozzari's medical needs.  While the issue is far from certain, viewed in the light most favorable to Plaintiff, there is enough evidence for a reasonable jury to find in Plaintiff's favor, and judgment as a matter of law is not appropriate.

Under the Fourteenth Amendment's Due Process Clause, the government has a duty to provide medical care to one who has been injured while being apprehended by the police.  *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).  To sustain a cause of action under 42 U.S.C. § 1983 for failure to provide medical treatment, a plaintiff must establish that a defendant acted with "deliberate indifference to serious medical needs."  *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  But deliberate indifference is not mere negligence.  "Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [a plaintiff's] health and safety."  *Watkins*, 273 F.3d at 686 (citing *Farmer v. Brennan*, 511 U.S. 825, 835–37 (1994)).

A deliberate indifference claim has two parts — one objective, one subjective.  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005).  For the objective component, Plaintiff must demonstrate "the existence of a 'sufficiently serious' medical need."  *Id.* (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004)).  As to the subjective

component, Plaintiff must demonstrate that the Officers possessed "a sufficiently culpable state of mind in denying medical care." *Estate of Carter*, 408 F.3d at 311 (citing *Blackmore*, 390 F.3d at 895)). Specifically, Plaintiff must demonstrate the Officers subjectively perceived facts from which to infer a substantial risk to his safety, drew the inference he was in danger, and then unreasonably disregarded that risk. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

It is undisputed that Scozzari's medical need was serious. He was shot five times and lay in a pool of blood. It goes without saying that Scozzari badly needed medical attention. A layperson would know that someone lying in a pool of blood after being shot needs medical treatment immediately in order to avoid death. *Estate of Carter*, 408 F.3d at 312. And the Officers "do not dispute that they were aware that Scozzari had been shot." Defs.' Mot. 4, ECF No. 215. Scozzari's obvious condition satisfies the objective requirement of the failure to provide timely medical treatment test. Further, it is clear that the Officers were well-aware that Scozzari's condition was serious.

The more complicated question is whether the Officers disregarded the substantial risk of serious harm to Scozzari's health. The Officers will prevail if they "responded reasonably to the risk, even if the harm ultimately was not averted." *Comstock*, 273 F.3d at 706 (quoting *Farmer*, 511 U.S. at 844). But the Officers may be liable even if they did not act "for the very purpose of causing harm or with knowledge that harm will result" if they "recklessly disregard[ed]" a known risk. *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 835–36). Viewed in the light most favorable to Plaintiff, there is sufficient evidence to satisfy a reasonable jury that the Officers did not respond reasonably to Scozzari's needs.

At trial, evidence was introduced that Defendant Miedzianowski reported shots had been fired just after 11:26 p.m.  Trial Tr. Vol. III, at 29.  Officer McGraw, however, testified that after Scozzari was shot, Miedzianowski waited one full minute before calling for emergency responders.  Trial Tr. Vol. IV, at 131.  When emergency vehicles did arrive, they were not permitted to enter the scene but were instead staged off-site at Miedzianowski's request. Miedzianowski testified that the ambulance was held back because Scozzari had weapons in his hands and the scene needed to be secured.  Trial Tr. Vol. V, at 142.  Miedzianowski finally called for the ambulance to come on-site between 11:34 and 11:35 p.m.  Trial Tr. Vol. III, at 11.

But testimony was received at trial that the Officers demanded that citizens enter the crime scene long before 11:34 p.m.  In fact, at least two men were led from their homes to view Scozzari's body after the shooting took place but before emergency personnel arrived.  Trial Tr. Vol. III, at 118–19; Trial Tr. Vol. VII, at 57–58.  Both men testified that Scozzari still had weapons in his hands.  *Id.*; Trial Tr. Vol. III, at 118.  One of these men testified he was pulled out of his cabin immediately after the shots were fired.  *Id.*

Further undermining the Officers' position, when emergency personnel finally reached Scozzari's body, they were forced to halt the administration of care when it was noted his body had not been checked for weapons.  Trial Tr. Vol. VII, at 6.  Once emergency responders moved away from Scozzari, elongating the time he went without assistance, two additional knives were removed from his person.  *Id.*  Knives that were not removed during the eight minutes between Miedzianowski's report of shots fired and his call for the ambulance to come on-site.  Knives that were not removed before McGraw escorted people to view Scozzari's body.  Knives that were not removed while Miedzianowski had emergency vehicles stage in order to "secure the

- 14 -

scene." This is enough evidence to satisfy the subjective component of Plaintiff's claim. The Officers are not entitled to judgment as a matter of law on this issue.

**2**

The Officers next claim that they are entitled to qualified immunity concerning Plaintiff's adequate medical care claim. The Officers are incorrect. In *Scozzari v. Miedzianowski*, 454 F. App'x 455 (6th Cir. 2012), the Sixth Circuit established,

> Reasonable officers would have known, based on this Circuit's precedent, that the obligation to provide adequate medical care to an injured detainee is not discharged merely by promptly calling for assistance, but extends to ensuring that medical responders are able to access the victim without unreasonable delay. Accordingly, we hold that Miedzianowski and McGraw are not entitled to qualified immunity on Plaintiff's deliberate-indifference claim.

*Id.* at 466. The fact that this decision was made before trial is of little consequence. The court based its conclusion specifically on the fact that it was clearly established "that failing to give medical responders immediate access to an injured detainee violates the Fourteenth Amendment." *Id.*

The Officers' attempt to distinguish the amount of time that emergency responders were prevented from assessing Scozzari is unpersuasive. Whether two minutes or twelve, forcing emergency responders to stage so that the scene could be made "safe" was unreasonable under the totality of the circumstances. All the Officers needed to do was ensure that Scozzari had no weapons and restrain him in some way. They did not accomplish that task during the six-minute delay between Scozzari going down and the arrival of paramedics. In fact, they did not accomplish that task while the ambulance was staged for the very purpose of securing the scene. Instead, paramedics had to abandon their task of delivering aid momentarily so that additional weapons could be removed from Scozzari. Reasonable officers would have secured the scene

- 15 -

long before.  The Officers are not entitled to qualified immunity on Plaintiff's denial of timely

medical care claim.

**3**

Finally, the Officers argue that the Court's decision to grant a new trial "is legally

erroneous and is contrary to controlling precedent of the United States Supreme Court."  Defs.'

Mot. 10.  They claim that *Carey v. Piphus*, 435 U.S. 247, 264 (1978) and *Memphis Cmty. Sch.

Dist. V. Stachura*, 477 U.S. 299, 310 (1986) establish that "a plaintiff seeking to impose liability

under 42 U.S.C. § 1983 must establish a causal link between the constitutional violation and the

plaintiff's alleged injury or damages."  Defs.' Mot. 10.  In other words, the Officers assert that

Plaintiff needs to prove their actions caused his death in order to recover.  The Officers are

incorrect, and their motion will be denied on this ground as well.

In *Estate of Owensby v. City of Cincinnati et al.*, 414 F.3d 596 (6th Cir. 2005), Roger

Owensby was severely beaten and strangled by police officers during a traffic stop.  *Id*. at 599–

600.  He was then placed in the back of a police cruiser, his face cut and bleeding.  *Id*. at 600.

Officers observed that Owensby may not be breathing, but did not do anything to provide

medical care while they waited for their supervisors.  *Id*. at 600–01.  When a police sergeant

arrived, he asked to check on the suspect, and discovered that Owensby was not breathing.  *Id*. at

601.  Owensby was given CPR, but was not resuscitated, and was later pronounced dead when

he arrived at the University of Cincinnati hospital.  *Id*.  The coroner indicated his death resulted

from "asphyxiation during restraint attempts."  *Id*.

In addressing the plaintiff's claim for denial of medical treatment, the district court held

that the estate need not prove the officers' failure to provide medical care was the proximate

cause of Owensby's death.  *Id*. at 604.  Affirming that decision on appeal, the Sixth Circuit

established that where an individual has a "serious need for medical care that was so obvious that

even a layperson would easily recognize the necessity for a doctor's attention," it is not necessary to show the denial of medical care caused death. *Id*. The court provided,

> In light of the facts as discussed above, we agree with the district court's assessment that Owensby's need for medical care was obvious. Accordingly, the estate need not prove that the officers' acts or omissions were the proximate cause of Owensby's death in order to hold the officers liable under section 1983.

*Id*. (citing *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004)).

This conclusion was applied directly to this case during the Officers' interlocutory appeal. In *Miedzianowski*, 454 F. App'x at 464, while deciding the question of qualified immunity, the Sixth Circuit assessed Plaintiff's delayed medical treatment claim:

> In the instant case, Defendants knew that the likely cause of Scozzari's collapse was one or more gunshot wounds. Furthermore, as they waited to ensure that Scozzari was not faking injury, the Officers observed a large pool of blood near his neck and heard gurgling sounds coming from his mouth. Lastly, when McGraw felt Scozzari for a pulse, he found none. A layperson under these circumstances would immediately recognize that Scozzari risked serious harm unless given immediate medical attention. Therefore, the questions to resolve are whether medical treatment was unreasonably delayed for non-medical reasons and whether this delay was due to deliberate indifference on the Officers' part.

The court went on to directly address the issue of proximate cause:

> This Court has explained that, in delay-of-treatment cases, it is not necessary to show that the delay in providing medical care proximately caused the injury. *See Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005). Instead, "the delay alone . . . creates a substantial risk of serious harm." *Id.* (quoting *Blackmore*, 390 F.3d at 899). Therefore, since Scozzari's need for medical care was obvious, whether the delay actually worsened his injuries is irrelevant to the analysis.

*Miedzianowski*, 454 F. App'x at 464 n.8. Accordingly, the applicable law maintains there is no requirement to link the denial of medical care to Scozzari's death with a showing of proximate cause.

The Officers argue that this "Court's reliance upon *Ormsby* [sic] is misplaced." Defs.' Mot. 13. They invite the Court to ignore this controlling authority and declare that Plaintiff must instead demonstrate proximate cause between the Officers' actions and his death under "controlling United States Supreme Court precedent." *Id*.

Generally, as noted by the Supreme Court in the cases the Officers rely on, proximate cause is a necessary element in any plaintiff's § 1983 claim. However, neither *Carey* nor *Stachura* involved the denial of adequate medical care, as here. Instead, *Carey* involved mental and emotional distress caused by the denial of procedural due process, 435 U.S. at 263, and *Stachura* involved a teacher that was suspended and sued for deprivation of liberty and property without due process of law, 477 U.S. at 301. The Supreme Court has not specifically addressed the issue before this Court.

But the Sixth Circuit has. Twice. In *Owensby*, the court established that when an individual has a "serious need for medical care that was so obvious that even a layperson would easily recognize the necessity for a doctor's attention," a showing of proximate cause is unnecessary. 414 F.3d at 604. As noted above, this decision was applied to this very case in *Miedzianowski*, 454 F. App'x at 466. Suffice it to say that while proximate cause is generally required, the Sixth Circuit has established a carve-out that applies here. Such a precedent is not contrary to the Supreme Court decisions discussed in Defendants brief, and it will be followed. Defendants' motion will be denied.

### III

The next motion to be addressed is the other side of the coin: Plaintiff's motion for summary judgment as to the Officers' liability on his adequate medical care claim. As previously discussed, it is not contested that Scozzari faced a serious medical need and that the Officers were aware of that need. Plaintiff argues that the Officers, as a matter of law, also

consciously disregarded that risk and unreasonably delayed Scozzari's access to medical care. Just as it cannot presently be determined that the Officers did not unreasonably delay Scozzari's access to care, it cannot be determined as a matter of law that they did.  Genuine issues of material fact exist on this issue, and Plaintiff's motion will be denied.

As noted by the Sixth Circuit, "it is not clear how long paramedics were staged offsite." *Miedzianowski*, 454 F. App'x at 468 (McKeague, J., dissenting).  Looking at the facts in the light most favorable to the Officers,

> The two-minute period from when paramedics were "at scene" (23:33) to "at patient" (23:35) was the time it took the paramedics to park their vehicle, get ready to make contact with Scozzari, and make their way to his location, which included traversing a distance estimated by paramedics to be somewhere between 75–200 feet.   Thus, the two-minute period is time that would have elapsed anyway, regardless of officer conduct.

*Id.* at 468–69.  Judge McKeague goes on to address the issue of why paramedics were asked to stage at all:

> On this more precise reading of the record, the instruction to stage offsite seems considerably less blameworthy.  Chief Miedzianowski gave the instruction to stage offsite when he radioed for medical help at 23:29, meaning simply that the officers had failed to secure the scene at that moment, three minutes after the shooting, not seven minutes after . . . In addition, the three-minute delay from when the paramedics were "at patient" (23:35) to when they were able to assess Scozzari (23:38) simply does not rise to the level of deliberate indifference.
>
> While the officers had removed weapons from Scozzari's hands and waistband when they handcuffed him prior to the paramedics' arrival, the officers had neglected to check the rest of Scozzari's body for weapons, requiring paramedics to stop their assessment while police checked again and removed additional weapons from Scozzari's pockets.  Such conduct — failing to thoroughly check Scozzari when initially securing him — is negligence at most, falling short of the conscious disregard required to meet the deliberate indifference standard. Plaintiff has not put forward any evidence to indicate that the officers subjectively knew that additional weapons were in Scozzari's pockets and consciously chose not to retrieve them before the paramedics began attending to him.

- 19 -

*Id.* at 469 (internal quotation marks and citation omitted).  As Judge McKeague points out, in the light most favorable to the Officers, there was no unreasonable delay of medical care, and certainly no deliberate indifference exhibited by the Officers.  Plaintiff's motion for summary judgment will be denied.

## IV

That leaves only Plaintiff's renewed motion for a new trial on his excessive force claim.  But Plaintiff offers nothing new to support his motion; nothing that was unknown when the Court made its previous decision on the issue.  For the same reasons outlined by the Court's November 7, 2012 Opinion & Order, Plaintiff's motion will be denied.

Although styled as a renewed motion, in reality Plaintiff's motion operates as a motion for reconsideration.  In fact, Plaintiff asserts that "[t]his motion seeks revision of the portion of the Court's November 7 order denying Plaintiff's motion for a new trial as to his excessive force claim."  Pl.'s Ren. Mot. 3–4, ECF No. 219.  Local Rule 7.1, however, requires a motion for rehearing or reconsideration be filed within 14 days after entry of the disputed order.  E.D. Mich. LR 7.1(h)(1).  Plaintiff's motion, filed on December 31, 2012, comes 54 days after the Court's November 7 Opinion & Order.  Further, Rule 7.1(h)(3) establishes that,

> Generally . . . the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court, either expressly or by reasonable implication.  The movant must not only demonstrate a palpable defect by which the court and the parties and other persons entitled to be heard on the motion have been misled but also show that correcting the defect will result in a different disposition of the case.

E.D. Mich. LR 7.1(h)(3).

Plaintiff does not even attempt to present novel arguments — instead he raises two of the three arguments that were expressly denied by the November 7 Opinion & Order.  Namely, the grounds for Plaintiff's renewed motion for a new trial are (1) "The Court's refusal to give

Plaintiff's requested Fourth Amendment Excessive Force instruction" and (2) "The Court's erroneous answers to Jury Notes 2 and 3, wherein the court narrowly interpreted the relevant sequence of events to be considered by the jury." Pl.'s Ren. Mot. 4. Plaintiff's motion could thus be denied before ever reaching its merits. But as explored below, even if timely, Plaintiff's motion lacks merit.

## A

Under § 1983, an individual may bring a private right of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statutes. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980). In *Tennessee v. Garner*, the Supreme Court established that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." 471 U.S. 1, 7 (1985). The Court explained that the reasonableness of the use of force is evaluated by balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* at 8, (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)) (further citations omitted). The ultimate question is "whether the totality of the circumstances justified a particular sort of search or seizure." *Garner*, 471 U.S. at 8–9.

Setting limits on the "totality of the circumstances" to be analyzed when assessing an excessive force claim, the Sixth Circuit has adopted a segmented approach. *See Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996). In *Dickerson*, police officers entered a man's home unannounced after it was reported that he had fired nine shots within. *Id.* at 1154. After hearing the man screaming threats and loading a weapon, one of the officers took cover near the kitchen of the home, and the other retreated outside. *Id.* The man then exited the front door,

allegedly aimed at the outdoor officer's position, and was gunned down. *Id*. at 1155. The officers estimated that the entire series of events took less than one minute. *Id*.

The plaintiffs in the case, including the deceased man's wife, argued that the conduct preceding the shooting was relevant to whether the officers' use of force was objectively reasonable. *Id*. at 1160. Although the officers violated the knock and announce rule and shot and killed the man within one minute's time, the court disagreed. *Id*. at 1162. "In reviewing the plaintiffs' excessive force claim, we limit the scope of our inquiry to the *moments* preceding the shooting." *Id*. (emphasis added). Despite the fact that the officers entered the home unannounced and may have increased the likelihood deadly force would be necessary, the court found it irrelevant for determining whether the subsequent use of deadly force was reasonable.

This conclusion was reinforced in *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007). There, Roland Rohm was barricaded in his house during a standoff with police. *Id*. at 401. Eventually, Rohm fled the residence and hid in the surrounding forest. *Id*. Officers approached his position in a lightly-armored vehicle in an attempted parlay, exposed above the waist through hatches in the roof. *Id*. As the officers neared Rohm, snipers saw him take aim with a rifle. *Id*. Two shots later, Rohm was dead. *Id*.

The plaintiff, citing *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002), argued the officers should be liable for using excessive force "because their reckless and unconstitutional provocation created the need to use force." In analyzing the claim, the Sixth Circuit "rejected such an analysis." *Livermore*, 476 F.3d at 406. While the plaintiff argued that officers had created the need for force by " 'rushing' the assault on Rohm," the court concluded that those actions "occurred in the hours and minutes leading up to Rohm's killing; *Dickerson* instructs us

to disregard these events and to focus on the 'split-second judgments' made immediately before the officer used allegedly excessive force." *Id.* at 407 (citing *Dickerson*, 101 F.3d at 1162).

## B

In this case, the Jury was instructed to assess the Officers' conduct on September 18, 2007 in light of "the totality of contextual events preceding the use of force that are in close temporal proximity." Jury Inst. III(C)(6)(D). Plaintiff's requested instruction, which included whether the Officers' "actions unreasonably add[ed] to, or increase[d], the risk that force might be used," is not consistent with existing legal authority. *See Dickenson*, 101 F.3d at 1162; *Livermore*, 476 F.3d at 406.

In his renewed motion, Plaintiff relies on *Claybrook v. Birchwell*, 274 F.3d 1098, 1103–04 (6th Cir. 2001) for the proposition that "segmentation should only be applied where there are logical breaks in the events leading to the use of force." Pl.'s Ren. Mot. 5. Plaintiff then concludes that the Officers' approach to Scozzari's cabin, and their attempt to kick in his door, must be a part of the jury's assessment as to whether the actions were reasonable. Upon review, however, *Claybrook* does not bear the weight Plaintiff argues it should.

*Claybrook* involved the Sixth Circuit's segmentation of the events that led to a fatal shooting outside of a marketplace. In doing so, the court concluded that "the evening's events are properly viewed in three segments: first, the officers' approach and confrontation of Claybrook; second, the initial firefight taking place in front of the market; and third, the shots fired after Claybrook's move to a position behind the concrete steps." *Claybrook*, 274 F.3d at 1105. The court did not ignore the first firefight when assessing the reasonableness of the second, noting that "the plaintiffs brought suit to contest *all* use of deadly force against their deceased father, not only the shot that took his life. Therefore, we must consider the

reasonableness of force used in both the second and third segments of the evening's events." *Id.* (emphasis in original).

The court did not, however, consider the reasonableness of the officers' initial approach. "Although the officers' decision to approach Claybrook in the manner that they did was in clear contravention of Metro Nashville Police Department policy . . . under *Dickerson*, any unreasonableness of their actions at that point may not weigh in consideration of the use of excessive force." *Id.*

As applied here, *Claybrook* only reinforces the legal authority for segmenting the incidents occurring at the door of Cabin 17 from those that took place before. The Officers' approach to the cabin and their attempt to open the door were not applications of deadly force, and so *Claybrook* does not require their consideration when determining whether the eventual application of deadly force was reasonable. In fact, coupled with the standard established by *Dickerson*, *Claybrook* counsels against the consideration of the Officers' approach to Scozzari's door, contrary to Plaintiff's contention.

## C

Finally, Plaintiff claims that the Court's answers to Jury questions two and three further construed the events of September 18 too narrowly, rendering a totality-of-the-circumstances assessment "meaningless." Pl.'s Ren. Mot. 9. Plaintiff argues that the Court "effectively limit[ed] the jury's consideration to the instant of the shooting." *Id.* Plaintiff ends by asserting that "Defendants' unconstitutional actions in trying to enter [Scozzari's] home without a warrant cannot, as a matter of law, be separated from their decision to use deadly force under *Claybrook*." *Id.* at 9–10.

Plaintiff is simply incorrect. The Court did not limit the Jury to the instant of the shooting, but instead limited the Jury only to "the events that occurred in close temporal proximity to the officers' decision to use lethal force." Pl.'s Mot. Ex. 6. Further, *Claybrook* does not stand for the proposition Plaintiff advances. The court there *did* segment officers' unnecessary approach from a subsequent shooting, instead only considering the application of deadly force in one instance when assessing the reasonableness of a second that occurred immediately afterwards. *Claybrook*, 274 F.3d at 1105.

It follows that *Claybrook* has only limited application here, where the Officers' approach to Scozzari's cabin was not an application of deadly force and was segmented from the conduct that lead to his death. Instead, *Dickerson* is more applicable, where the officers' unlawful entry into the decedent's home, which directly led to the need of deadly force, was not considered when determining the reasonableness of the officers' use of that force. As before, the Court continues to believe that the answers to the Jury's questions were appropriate. The events of September 18 were segmented in accordance with controlling authority, and the Court's responses guided the Jury to the appropriate circumstances for its consideration.

The decision aligns with the arguments Plaintiff has previously made in this case. Alleging that Plaintiff's claims were not barred by *res judicata* after Scozzari II was dismissed, Plaintiff established that the events of Scozzari II (the use of pepper spray in the parking lot and the Officers positioning themselves outside of Scozzari's door) were "plainly separate and discrete" from the events of this case (the use of lethal force after Scozzari exited his cabin and the later alleged indifference to his medical needs). Plaintiff wrote,

> The wrongful acts giving rise to the claims in Scozzari I are plainly separate and discrete from the wrongful acts that give rise to the claims in Scozzari II. The wrongful acts alleged by Plaintiff as providing the factual basis for the claims in Scozzari II involved the encounter between William Scozzari and Defendant

- 25 -

Miedzianowski prior to Scozzari entering his cabin, as well as Defendants Miedzianowski's and McGraw's attempts to force entry into Scozzari's cabin. By contrast, the wrongful acts providing the factual basis for the claims in Scozzari I all involved the actions of Defendants *after Scozzari exited his cabin*, to wit: shooting Scozzari and then delaying crucial medical treatment. *There is no overlap between the wrongful acts underpinning the claims in Scozzari II and the wrongful acts underpinning the claims in Scozzari I.*

Pl.'s Answer in Opp. 7–8, ECF No. 190 (emphasis added). As Plaintiff identified, the two situations are distinct, and were properly segmented when determining the reasonableness of the Officers' use of deadly force. The answers responding to the Jury's questions did not improperly narrow the Jury's consideration of the relevant time-frame, and does not support a finding of error or a new trial.

**V**

Accordingly, it is **ORDERED** that Defendant's motion for relief and for judgment as a matter of law, ECF No. 215, is **DENIED**.

It is further **ORDERED** that Plaintiff's motion for summary judgment as to the Officers' liability on the denial of timely medical care, ECF No. 220, is **DENIED**.

It is further **ORDERED** that Plaintiff's renewed motion for a new trial regarding his excessive force claim, ECF No. 219, is **DENIED**.

Dated: January 28, 2013                                    s/Thomas L. Ludington
                                                            THOMAS L. LUDINGTON
                                                            United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 28, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS
